**STERLING DRUG, INC., a Corporation, Appellant,**

v.

**Irene M. YARROW, Appellee.**

**No. 18901.**

United States Court of Appeals
Eighth Circuit.

March 12, 1969.

R. J. Leonard, Terence O'Loughlin of Altman, Geraghty, Leonard & Mulally, St. Paul, Minn., for appellant; Woods, Fuller, Shultz & Smith, Sioux Falls, S. D., with him on the brief.

Ellsworth E. Evans, of Davenport, Evans, Hurwitz & Smith, Sioux Falls, S.D., for appellee; Robert C. Heege, Sioux Falls, S. D., with him on the brief.

Robert E. Giles, Gen. Counsel, Rodney R. Munsey, Asst. Gen. Counsel, and Carl T. DeMarco, Atty., Pharmaceutical Manufacturers Assn., Washington, D. C., on brief for Pharmaceutical Manufacturers Assn., amicus curiae.

Before VOGEL and LAY, Circuit Judges, and BECKER, Chief District Judge.

BECKER, Chief District Judge.

This is an appeal by Sterling Drug, Inc. ("Sterling" hereinafter) from a judgment in favor of appellee, a South Dakota housewife and mother of four children, for damages in the sum of $180,000.00 in a civil diversity product liability action. Appellee claimed that her vision had been permanently damaged by use of a prescription drug manufactured and sold by appellant for use in treatment of rheumatoid arthritis and other diseases.

The action was tried without a jury before Chief Judge Fred J. Nichol of the United States District Court for the District of South Dakota whose findings of fact and conclusions of law were stated in a "Memorandum Decision" reported in 263 F.Supp. 159.

Appellee based her claim for damages on specifications of alleged negligence of the defendant in testing, manufacturing and marketing the drug "Aralen" (also known as "Aralen Phosphate") and in failing to warn the public, appellee, her physician and retail drug dispensaries, from which appellee purchased the drug, of the potential danger to "eyesight and vision" from the use of the drug, which "the defendant well knew, or should have known in the exercise of due care."

After a plenary evidentiary trial the trial court found in favor of the appellee because of negligent failure of Sterling to warn appellee's prescribing physician, Dr. Robert G. Olson of Sioux Falls, South Dakota.

### Assignments of Error

Appellant Sterling assigns error in the findings and conclusions of the trial court in the following points:

1. "The trial court's ultimate determination herein was that appellant did not fulfill its duty to warn appellee's doctor of the possible side effects of Aralen. However, said ultimate determination was induced by an erroneous conclusion of law whereby the trial court charged appellant with a duty to warn 'by the most effective method.' As a consequence, the appellate court is free to disregard the trial court's erroneous conclusion of law as well as its ultimate determination that appellant did not fulfill its duty to warn.

2. "The trial court's finding that detail men '* * * present the most effective method of warning the doctor * * *' is unsupported by the evidence and is clearly erroneous.

"The overwhelming weight of the evidence indicates that appellant made reasonable effort to warn. (by)

"The warning letter. (and)

"The Physician's Desk Reference."

The brief of amicus curiae, Pharmaceutical Manufacturers Association, supports appellant's assignments of error.

### Evidence of History, Uses and Side Effects of Accused Drug

### Early History of Drug—

The accused drug in this case is chloroquine phosphate which was marketed by appellant, under the registered trademark names "Aralen Phosphate" and "Aralen". Its chemical structure is described as follows: "7-chloro-4 (4 diethylamino-1-methylbotylamino) quinoline diphosphate." It is also known as one of the "4-aminoquinolines." In the testimony on the early history of the ac-

cused drug by appellant's witness Dr. Justus B. Rice, formerly Director of appellant's Department of Medical Research from 1937 to 1960 (corroborated in part by other oral and documentary evidence) the history of 4-aminoquinoline compounds (of which the accused drug was one) was described substantially as follows: At Elberfeld, Germany, about 1935, chloroquine resorcinate (a 4-aminoquinoline) was synthesized by a researcher. Chloroquine resorcinate, among 4 other aminoquinolines, was superficially tested by Dr. Kikuth in the Canaries and found to be active in malaria. Dr. Kikuth then sent it to Dr. Seolli of Rome who tested it, with other compounds, on five patients. Dr Seolli found chloroquine resorcinate to be too toxic for use in humans. Dr Seolli discarded chloroquine resorcinate in favor of a similar 4-aminoquinoline compound, called "Sontochin". Appellant then had a cross-licensing agreement with I. G. Farben Industry of Germany from which it learned of the synthesis of chloroquine phosphate. I. G. Farben Industry sent appellant the manufacturing "know how" of all compounds which it synthesized. This information "lay fallow" in appellant's files until the onset of World War II. Then, for nonmedical reasons, an urgent demand arose for an anti-malarial drug which was better than quinine and atabrine. So the National Research Council of the United States began a "crash program" to get this new anti-malarial drug as quickly as possible, forming a Committee for Anti-Malarial Studies. This committee enlisted the aid of and endowed everyone who knew anything useful about synthesizing or making anti-malarial drugs.

In the spring of 1945, just before the end of the war in Europe, the United States Army sent Dr. Rice, as a member of the Combined Intelligence Subcommittee (G-2) to Europe to question German scientists on work or information which might be useful in the war against Japan. In that duty Dr. Rice heard of chloroquine phosphate.

By the United States Government, the drug was then given the most comprehensive and painstaking study theretofore ever given a drug before it was put on the market. In this study every compound which anyone suggested to be possibly useful in malaria was sent in, screened and tested. About 16,000 compounds were given preliminary screening. Most of them were inactive, but there were about 80 compounds thought to be active. These 80 compounds were tested in several species of animals for activity in animal malaria, and toxicity studies were made in several species of animals. For one or more reasons all except 14 of the 80 compounds were eliminated. These 14 compounds were then tested on humans who were prisoners in Statesville Prison in Illinois and in the Atlanta Penitentiary in Georgia. Of the 14 compounds, all except chloroquine phosphate were eliminated. Then with approval of the Food and Drug Administration of the United States ("FDA" hereinafter) the drug was put on the market.

Dr. Rice and Dr. Foley [1] in their testimony on the history of the accused drug stated in substance the following: In August 1946 appellant secured approval of the FDA for sale of chloroquine phosphate for use in malaria on prescription of an authorized practitioner. Thereafter reports began to appear in medical literature of successful uses of chloroquine phosphate in the treatment of amebiasis, skin diseases including lupus erythematosus, and rheumatoid arthritis. In 1951 Dr. Hadu read a paper in Spain about the beneficial use of chloroquine phosphate in rheumatoid arthritis, but the paper was not published until 1953, when it came to the attention of the appellant's staff.

Beginning in 1953 at the suggestion of interested independent investigators, appellant supplied materials, grants and

[1]. Medical Director and Vice President of Winthrop Laboratories Division of appellant Sterling, who was called and examined as an adverse party by appellee and as a witness by appellant.

services for studies of the drug, in the treatment of rheumatoid arthritis, by Dr. Bagnell of the University of British Columbia and others.

From the reports of the investigators the drug seemed to be active and the results seemed to be good in the treatment of rheumatoid arthritis. So in July 1957 appellant made application to FDA for approval of use of chloroquine phosphate in rheumatoid arthritis and lupus erythematosus. Within two months, approval of this application was received. At some unspecified time prior to July 1959 the drug was also approved for use in extraintestinal amebiasis.

At all times relevant, the drug was supplied in tablets of 250 milligrams each, and the dosage for adults in the treatment of rheumatoid arthritis recommended by appellant was 250 mg. daily.

*Evidence of History of Treatment and Use of the Drug by Appellee*

Appellee was a patient of a clinic in Sioux Falls, South Dakota, since 1949 at least. On August 1, 1953, Dr. Robert G. Olson, a physician engaged in the general practice of medicine, began practice in Sioux Falls as an associate of this clinic. Appellee first consulted Dr. Olson as a patient April 7, 1954, for influenza.

Appellee had been treated by a former associate at the clinic for inflammatory rheumatoid arthritis in December 1950. Later in January 1951, she was admitted to the Sioux Valley Hospital for four days for treatment of arthritis, as a result of which she began receiving injections of a medication, known as "Cortone", a trade name. She continued to receive these injections, at intervals, until January 31, 1951.

At other times from 1950 to 1958, appellee had suffered from arthritis which she had controlled reasonably well with salicylates.

In January 1958, appellee complained to Dr. Olson of increased arthritic activity and increased discomfort. Dr. Olson, who had been introduced to the accused drug by appellant's "detail man", William Wilka, prescribed the accused drug for treatment of appellee's arthritis. For this, Dr. Olson, whose clinic did not stock drugs, prescribed the dosage of 250 mg. daily recommended by appellant as a standard moderate dosage. The prescription was ordered by Dr. Olson to be refillable on order of the patient without further prescription, with the intention that the patient should continue its use daily for an indefinite period of time. At this time appellant had given no notice of any limitations on the period of the use of the drug, or of any irreversible side effects of its use.

With insignificant omissions, appellee continued the daily use of the drug until October 19, 1964, when it was discontinued on advice of Dr. Olson at the time of a complete physical examination.

The complete physical examination was made at the suggestion of Dr. Sidney Becker, of Sioux Falls, an ophthalmologist. Appellee, who wore glasses, had consulted Dr. Becker, first in April 1955, for a general ocular examination when new glasses were prescribed, which corrected her vision to 20/20 in each eye.

While using the drug, from January 13, 1958, to October 19, 1964, appellee consulted with Dr. Olson personally or by telephone many times.[2]

2. A summary of these consultations is as follows:

1958

*February 7*: Patient admitted to hospital for 48 hours.

*March 10*: Patient, still taking Aralen, seen for checkup following surgery.

1959

*April 13*: Patient, examined for sore throat, still taking Aralen.

*May 9*: Patient examined.

*July 14*: Patient, who received polio vaccine booster, presumably still on Aralen.

1960

*March 30*: Periodic complete physical.

*August 10*: Blood pressure of patient

During this period Dr. Olson did not, at any time, advise appellee to discontinue the use of Aralen. On occasions during this period, being unaware of its serious and irreversible side effects, he affirmatively recommended its continued use. At all times during this period Dr. Olson presumed that his prescription for the indefinite use of Aralen was being followed by appellee. On one occasion during this period, Dr. Olson gave a new prescription for Aralen to permit appellee and her husband to purchase the drug at a pharmacy closer to their residence than the one first patronized by appellee.

On April 8, 1960, and March 1, 1963, while using the drug, appellee again consulted her ophthalmologist, Dr. Becker.

She was complaining of headaches on April 8, 1960. An examination then showed her vision to be 20/20 in each eye, but her near vision to be failing

slightly to 14/21. No new glasses were prescribed at that time. The medication Cafergot was prescribed for tension type vascular headaches. On March 1, 1963, appellee was found to have 20/20 vision but to be presbyopic. Bifocal glasses were prescribed which corrected her near vision to 20/20 in each eye. Her retina was found by Dr. Becker to be normal on this visit.

On October 12, 1964, appellee, complaining of poorer vision, consulted with Dr. Becker, who made a complete ocular examination. This complete examination included the following separate examinations: external of the pupils and clearness of the eye, of the retina; of the extraocular muscle function, of the intraocular tension, and slit-lamp. On this visit Dr. Becker found that appellee was developing macular degeneration in each eye, which occurred sometime between his last examination of March 1, 1963, and October 12, 1964.

checked and found in upper limits of normal.

### 1961

*March 21*: Patient examined for sore throat and for routine blood pressure check; blood pressure elevated for which Salusentin prescribed.

*March 29*: Patient examined and blood pressure found reduced some; medication satisfactory and continued.

*April 26*: Patient examined and blood pressure found satisfactory; Salusentin dosage reduced; patient continued on Aralen, one daily.

*June 28*: Patient examined and blood pressure found within normal limits in response to medication.

### 1962

*January 12*: Patient given by nurse, preliminary work for scheduled complete physical examination.

*February 14*: Patient given physical examination; no changes from last examination found; patient continued on Salusentin, one daily, and on Aralen, one daily.

*April 2*: Patient examined and advised to continue on Salusentin, one daily, and on Aralen, one daily.

*June 28*: Patient consulted by telephone.

*October 12*: Patient's blood pressure checked and found satisfactory but elevated from previous examination; no

increase in Salusentin prescribed; patient is presumably still on Aralen.

*October 26*: Patient's blood pressure found satisfactory; patient was continued on Salusentin.

*December 13*: Patient's blood pressure checked and was 126/80, well within normal range; Salusentin discontinued.

### 1963

*January 2*: Patient returned for blood pressure check which was satisfactory; patient was continuing on Aralen, one daily; patient was advised to return in two weeks for blood pressure check.

*January 16*: Patient returned for blood pressure check which was elevated; Hydrodiuril, 50 mg., one daily, was prescribed for high blood pressure.

*January 31*: Patient's blood pressure was checked and found still elevated but lower than on previous visit; other medications, including Aralen, were "continued the same".

*May 8*: Annual examination of patient was made with negative results; general condition of patient was found satisfactory; patient was presumably still on Aralen.

*October 21*: Patient examined; patient's blood pressure was checked and found elevated to an unsatisfactory level for which Salusentin was again prescribed two daily; patient was advised to continue on Aralen, one daily

Dr. Becker had heard of chloroquine retinopathy in 1964. So, after the examination of October 12, 1964, he called Dr. Olson, appellee's physician, and suggested that Dr. Olson make a complete physical examination of appellee in an effort to determine the causes of appellee's failing vision. He further suggested that it be determined whether any medications contributed to appellee's condition.

Appellee visited Dr. Olson October 19, 1964, who on inquiry learned that appellee was unable to drive early in the morning or late at night when there was a limited amount of light and that she was having difficulty reading and sewing. Dr. Olson then gave appellee a complete physical examination from which he made findings, unrelated to her eyes, that her blood pressure was at a satisfactory level, that she was having headaches and irregular menstrual periods, and that the Pap smear showed no evidence of malignancy. At this time Dr. Olson had not read or heard of any warnings concerning irreversible chloroquine retinopathy from any source except Dr. Becker's recent telephone call.

Nevertheless, on October 19, 1964, Dr. Olson discontinued appellee's current medication, Aralen and Salusentin, and recommended a follow-up visit, which was made January 11, 1965. On this follow-up visit appellee complained of headaches and reported that her vision was considerably more blurred, although she had discontinued use of Aralen as advised in October 1964. On this visit, her blood pressure was found higher than maintained on Salusentin but satisfactory.

In January 1965, appellee consulted Dr. Willcockson of Yankton, South Dakota, a practicing physician, specializing in diseases of the eye, and Clinical Professor of Ophthalmology at the School of Medical Science of the University of South Dakota. Dr. Willcockson examined appellee and found that she had inability to see beyond 20 per cent with either eye, with or without glasses, and that she had specific toxic destruction in the macula of the retina of both eyes. He found no evidence of pathological changes in the cornea but found typical irreversible destruction of the pigment layer in the macula, identical in each eye. Dr. Willcockson's opinion was that destruction of the pigment layers was directly attributable to the chloroquine (Aralen) used as medication by the appellee. A subsequent examination of appellee, by him, thirteen months later showed no changes. Dr. Willcockson charted a large central total blind spot (central scotoma) in each of appellee's eyes, which left her with only peripheral vision. Glasses, in his opinion, cannot improve this permanent partial blindness. Both Dr. Willcockson, and Dr. C. W. Rucker, ophthalmologist of the staff of the eye section of Mayo Clinic, who examined appellee in March of 1965, testified that in appellee's case, the chloroquine acted as toxin, destroying the pigment layer of the macula and the nerve fibers passing into the layer so they do not function.

The plaintiff, corroborated by her husband, testified without contradiction that, once a day as directed by Dr. Olson, she used Aralen purchased at pharmacies in Sioux Falls; that, until after her return in July 1964 from a vacation motor trip to the Eastern United States, she had no difficulty in reading periodicals and road maps, driving a car, viewing television, doing housework, recognizing people by sight, threading a needle and sewing and cooking, though glasses helped her; that after her return from the motor trip she noticed much disturbance between herself and what she was trying to see, like a halo, and especially the difference in lights, which bothered her eyes; that it was hard for her to see late in the day near dusk; that her vision steadily became worse, affecting her housework, her reading and sewing, and her ability to drive a car; that presently she can read a newspaper a little only, with a magnifying glass, cannot read printing on television or see the detail in people's faces on television or in meeting people; that

she cannot recognize her children or acquaintances by sight unless they are close, cannot read recipes without a magnifying glass, cannot pour liquids without difficulty, cannot thread a needle, cannot drive a car, in viewing scenery cannot see details, and that her visual perspective is bad.

*Evidence of Reported Developments in Knowledge of the Side Effects of Chloroquine Phosphate on the Eye Prior to October 19, 1964*

Appellee discontinued the use of the accused drug on October 19, 1964. Therefore, the relevant period concerning the knowledge of its side effects on the human eye is the period prior to October 19, 1964. The evidence is ample to support the findings that during this period appellant knew, or in the exercise of reasonable care should have known, of the following reports:

*1957*: In March, Dr. Goldman and Dr. Preston, Cincinnati dermatologists, reported side effects on the eye of chloroquine in lupus erythematosus patients. Dr. Cambiaggi reported retinal changes as an unusual manifestation of lupus erythematosus.

*1958*: British doctors questioned the effect of chloroquine in damaging the cornea, stating that the damage was from disease or the drug. Drs. Zeller and Deering, of the University of Oregon Medical School, reported corneal changes from the use of the drug. Dr. Calkins reported corneal changes in the Archives of Ophthalmology. Hobbs and Calnan in Lancet in June reported corneal changes from use of the drug.

*1959*: In January, Drs. Sternberg and Laden, dermatologists, reported side effects of chloroquine on the eye in the American Journal of Dermatology. Incidence of corneal changes in 43 per cent of patients using the drug for rheumatoid arthritis was reported by Drs. Kersley and Palen in 2 Lancet 886. The report of the toxic effect of chloroquine first appeared in England. In October, Dr. Fuld in a letter re-

ported central scotoma and macular degeneration from the use of chloroquine by a patient for arthritis. Drs. Hobbs, Sorsby and Freedman reported side effects of chloroquine on the eyes in October.

*1961*: Drs. Hobbs, Eadie and Somerville reported that corneal change had been found in 32 per cent of patients with rheumatoid arthritis and in 36 per cent of those with skin lesions, using chloroquine. 45 British Journal of Ophthalmology 284. In this article the incidence of retinal changes was reported to be 2 per cent to 3 per cent of those taking the drug more than a year. Further, this report stated that the retinal changes appear, in most patients, to be irreversible at the stage they are detected. Reports of the toxic effect of the drug began to appear in the United States. Drs. Ellsworth and Zeller reported retinal damage to patients from the drug in an article entitled *Cholorquine-Induced Retinal Damage*. Dr. Rebello of Cincinnati reported some cases of retinal eye damage from chloroquine in an article entitled *Retinopathy Associated With Chloroquine* published in the *Journal of the American Medical Association*. Drs. Richards and Wilson reported retinal damage from chloroquine in an article bearing the same title published in the same journal. The annual report of the American Medical Association on New and Nonofficial Drugs reported 10 per cent of patients with rheumatoid arthritis and lupus erythematosus unable to tolerate adequate doses of the drug and that in a few cases prolonged therapy was associated with irreversible retinal damage characterized by macular degeneration and scotomatous vision.

*1962*: Dr. Leopold in a letter published in the *Journal of the American Medical Association* entitled *Chloroquine and Ocular Damage*, summarized earlier British reports stating that the damage produced by chloroquine and hydroxychloroquin consists essentially of corneal and retinal

changes. The incidence of retinal changes was estimated at 2 per cent to 3 per cent of the patients on the basis of the British reports. Dr. Leopold noted that those who developed retinal changes had been taking the drug for more than a year, and usually for several years. He further reported that, while the corneal changes clear spontaneously on withdrawal of the drug, the retinal changes appear in most patients to be irreversible at the stage of detection. Dr. Leopold gave citations to the British articles by Drs. Kersley and Paline in 1959, and by Drs. Hobbs, Eadie and Somerville in 1961. Numerous other reports of the toxic effects of chloroquine appeared in the United States. Dr. Mayer reported field defects, retinal damage, and paracentral scotoma from the use of chloroquine. Dr. Smith reported on macular degeneration caused by chloroquine in the *Archives of Ophthalmology*. Drs. Sachs, Hogan and Engelman published an article on the subject entitled *Chlororetinopathy Induced By Chloroquine*. Drs. Reed and Campbell published an article on *Central Scotoma Following Chloroquine Therapy* in the *Canadian Medical Journal*. Drs. Sataline and Farmer reported on the subject in the *New England Journal of Medicine* in an article entitled *Impaired Vision Following Prolonged Chloroquine Therapy*, reporting that 18 per cent of the patients taking chloroquine suffered retinopathy from a toxic effect and not from a drug idiosyncrasy. Dr. Arden and others published an article entitled *Anticipation of Chloroquine Retinopathy* suggesting an eye test to detect eye changes. Abroad Dr. Jansen reported on the subject in an article entitled *Retinopathy Following Chloroquine Medication* in a Dutch medical journal. Dr. Coffi published in the *Italian Medical Journal* an article on *Retinal Changes Caused by Chloroquine*. In September a manuscript was submitted to the FDA, entitled *Chloroquine Retinopathy*, by the National Institute of Neurological Diseases and Blindness. This article reported 26 cases of retinopathy from chloroquine.

*1963*: In June an editorial appeared in the *Journal of the American Medical Association* on *Chloroquine Retinopathy*. In the same journal in July an article entitled *Ocular Changes With Chloroquine Phosphate* appeared. In October the same journal published an article on *Antimalarial Drugs and Eye Changes*. Drs. Okun, Bernstein and Van Sallman reported on eight cases of chloroquine retinopathy in referred patients in the *Archives of Ophthalmology*. Drs. Rubin, Bernstein and Zvaifler reported on the period of time the drug remained in the body after discontinuance of use in an article entitled *Pharmacology of Chloroquine*. An article by Drs. Gourgas and Gunkel, entitled *Electro-Oculargrams in Chloroquine and Other Retinopathies* was published in *Archives of Ophthalmology*. Dr. Kennedy and others published an article entitled *Chloroquine: Therapeutic Indications and Side Effects* in the *Southern Medical Journal*. In the *Maine Medical Journal* there appeared an article on the subject, entitled *Ocular Complications of Drug Therapy*. Dr. Tuffanellic and others reported on chloroquine retinopathy among other effects of chloroquine in *Archives of Dermatology*. Drs. Henkind and Rothfield reported on the side effects of chloroquine on the eyes in an article entitled *Ocular Abnormalities in Patients Treated With Synthetic Antimalarial Drugs*, published in 269 *New England Medical Journal* 433. This last report suggested that 18 per cent of the patients taking chloroquine were affected. Dr. Dubois, in a letter published in the *Journal of the American Medical Association*, reported on the side effects on the eye of chloroquine. An article, entitled *Ocular Complications of Treatment With Chloroquine*, was published in the *Canadian Medical*

*Journal.*[3] In the *British Medical Journal* Dr. Rab published an article on *Chloroquine Toxicity* and psychosis caused by chloroquine. Dr. Voipo reported on the side effects of chloroquine on the eye in the *Finnish Journal.*

In addition to all the foregoing reports civil actions for damages were filed in 1962 and 1963 against appellant by plaintiffs alleging that they suffered macular degeneration from the use of Aralen.

## Warning by Appellant of Danger to Eyes From Use of the Drug

The evidence strongly supports the findings of the trial court that appellant usually communicates its product information to physicians prescribing its products:

(1) by "detail men", who are specially trained field representatives engaged in selling and promoting the use of its products by personal calls in which oral presentations are made and literature and samples delivered,

(2) by listings of drugs in an annually published advertising medium known as Physicians' Desk Reference,

(3) by "product cards" which are mailed and distributed by detail men to physicians and are available at medical conventions and hospital exhibits, and

(4) by special letters mailed to physicians.

The evidence summarized in part hereinabove also strongly supports the finding of the trial court that, beginning in 1957, medical publications suggested some connection between retinal eye changes and chloroquine; that from the medical publications this connection became increasingly evident by the year 1959 and reasonably apparent in the year 1962; that in 1961 reports that the retinal changes associated with the drug were irreversible began to appear.

These publications were received currently and read carefully by the medical librarians in the medical department of appellant, which also supplied information to physicians and medical information and instruction to detail men trained under the auspices of the Department of Sales Promotion of appellant.

Nevertheless, the detail men who made regular personal calls on prescribing physicians and customers were never, in the relevant period, instructed to invite attention of the physicians and customers to the reported dangers of irreversible retinal damage from prolonged use of the drug by patients. The warnings of side effects in general, and of retinal damage in particular, when given by appellant were limited to the product cards, the Physicians' Desk Reference and to the "Dear Doctor" letter dated February 1963, discussed hereinafter.

The record shows that appellant was contemporaneously aware of the reports, summarized above, that chloroquine phosphate caused irreversible retinal damage in a substantial percentage of those using the recommended dosage for rheumatoid arthritis for extended periods of time. The evidence supports the findings of fact of the trial court concerning the limited nature of warnings given by appellant to those prescribing the drug. These findings of fact are not clearly erroneous within the meaning of Rule 52(a) F.R.Civ.P.

On this record of the medical reports summarized above, the trial court would have been warranted in holding that the warnings on the product cards and in the Physicians' Desk Reference concerning irreversible retinal damage did not always, in the relevant period, represent the full state of the reported medical knowledge in respect to the percentage of patients affected, the irreversibility of the retinal damage and the toxicity of the recommended drug in affected cases. (This is mentioned be-

---

3. This last reference cannot be determined certainly from the record.

cause appellant contends that the judgment below should be reversed outright on the ground that a submissible case of failure to warn was not made on any theory.)

Dr. Foley, appellant's Medical Director and Vice-President, testified that in August 1962, because of appearance of additional reports of side effects of chloroquine, that he, and other members of appellant's staff, felt that appellant should add additional information in the literature on the drug. To do so (he testified) appellant's staff consulted with the Food and Drug Administration until January 1963, finally developing the letter, the "Dear Doctor" letter. In the meantime, no special warning was given physicians. During this period appellant's staff was unwilling to accept the accuracy of the percentages of affected patients reported in the medical literature, and questioned the figures. Finally in January 1963, through its advertising department, appellant contracted with a mailing service, specializing in mailings to the medical profession, for the mailing of the "Dear Doctor" letter to all physicians and hospital personnel in the United States. Some 248,000 copies of the letter were reproduced, were mailed in envelopes addressed by addressograph plates and sent by first class mail. The letter read as follows:

"IMPORTANT DRUG PRECAUTIONS

"Dear Doctor:

"The recent experience of various investigators has shown that Aralen (R) (brand of chloroquine), used alone or as an adjunct to other drugs and therapeutic measures, may be very helpful in the management of patients with lupus erythematosus or rheumatoid arthritis. Although many physisians have found that the incidence of serious side effects is lower than that encountered with other potent agents that are often employed in such patients, certain ocular complications have sometimes been reported during prolonged daily administration of chloroquine. Therefore, when chloro-quine or any other antimalarial compound is to be given for long periods, it is essential that measures be taken to avoid or minimize these complications.

"Thus initial and periodic (trimonthly) ophthalmologic examinations (including expert slit-lamp, fundus and visual field studies) should be performed. The initial examination will reveal if any visual abnormalities, either coincidental or due to the disease, are present and will establish a base line for further assessment of the patient's vision. Should corneal changes occur (which are thought to be reversible and which sometimes even fade on continuance of treatment), the advantages of withdrawing the drug must be weighed in each case against the therapeutic benefits that may accrue from continuation of treatment (sometimes a severe relapse follows withdrawal). If visual disturbances occur—which are not fully explainable by difficulties of accommodation or corneal opacities—and particularly if there is any suggestion of visual field restriction or retinal change, administration of the drug should be stopped immediately and the patient closely observed for possible progression.

"We should like to request your cooperation in reporting to Winthrop Laboratories or to the Food and Drug Administration any patients in your own practice who have developed impairment of vision or retinal change during or subsequent to the administration of chloroquine.

"A reference card of a convenient size for filing is enclosed. It contains information on the various indications for Aralen (including lupus erythematosus, rheumatoid arthritis, malaria and amebiasis), dosage, side effects and precautions.

"Very truly yours,
"WINTHROP LABORATORIES
/s/ E. J. Foley
E. J. Foley, M. D.
Vice President
Medical Director"

Dr. Justus B. Rice, who retired in 1960, formerly Director of the Department of Medical Research of appellant, called by appellant as an expert witness for appellant, testified in part as follows:

"Q. Now, let me ask you this first, doctor: in view of the seriousness of the situation, why wasn't these letters sent out by registered mail or certified mail? A. I have no idea. This all happened after I left, and was not in my department.

"Q. I realize that, but you had been with this company for how many years? A. Since 1937; about 23 years.

"Q. And had been a vice president of it? A. That's right.

"Q. And let me ask you this: based on your experience, wasn't there one way to make sure that every doctor had the information, and that was to instruct your detail men to call on every doctor? A. I don't know whether that would have done it or not.

"Q. But that would have been a way of having a personal contact, wouldn't it? A. It might have.

"Q. Yes. And a personal contact, then, would be something that we could show here in court, couldn't we? A. I don't know how you'd show it.

"Q. Well, after all is said and done, I'll put it this way: you're here, Dr. Rice, and I'm here? A. Yes.

"Q. Now, if five years later or ten years later, one of us says that he wasn't here, don't you think it's easy to prove with the people that are here in this courtroom? A. Yes, that's a case."

Appellant called as an expert on practices in the drug industry Dr. George Hazel, Vice President of Medical Affairs of Abbott Laboratories, which did not supply chloroquine phosphate. Dr. Hazel undertook to testify, without objection, as an expert on the actions and alleged omissions of appellant under industry custom. On cross-examination this witness testified as follows:

"Q. Well, doctor, don't you agree that that ought to be up to the physician to determine whether or not he wants to continue giving a drug to a patient, where there's going to be serious side effects? A. It is up to the physician.

"Q. And if it's up to the physician, then isn't it imperative that the manufacturer of that drug see that the physician who is prescribing the medicine has full knowledge, of these serious side effects, so that he can weigh and make his own determination? A. *I think the drug manufacturer makes what he and for the most part the medical profession and the official control agencies of the drug industry feel is the best method of acquainting the physician with these dangers.* The degree to which the drug manufacturer should try to teach the doctor therapy and all about drugs is debated. Some of the people in academic medicine feel that the drug industry should have little part in this. The drug industry operates under certain legal requirements and what are generally considered moral responsibilities. (emphasis added)

"Q. I don't think you've answered my question, and I'll ask it again. I believe you can answer it yes or no, doctor. I don't want to belabor the point, but don't you agree with me that it is the duty of the manufacturer of a drug, when it has knowledge that serious side effects have occurred, to see that the physicians that's prescribing such a drug are given notice of these serious side effects, and of the possibility that their patients may suffer such serious side effects from the continued use of that drug; don't you believe that that's the duty of the drug company? A. I think that is a duty of the drug company, and it has been done."

Dr. Hazel's opinion that, in this case, appellant had complied with its duty to inform physicians prescribing the drug of its side effects is not binding on the trial court. But his opinion that a drug manufacturer, under industry practice, employs what is felt (by the medical profession and official industry control agencies) to be the "best method of acquainting the physician" with the dangers may be considered by the trial court in determining the issue of reasonableness of the warnings given by appellant.

### Dr. Olson's Lack of Knowledge of Dangers of Use of the Drug

The direct and circumstantial evidence amply supports a finding that, prior to October 19, 1964, Dr. Olson was not aware of the dangers of irreversible retinal damage from prolonged use of the drug. There was ample direct evidence from Dr. Olson, and opinion evidence from qualified professional witnesses, to support the findings that Dr. Olson (and other general practitioners) receive so much literature on drugs that it is impossible to read all of it; that Dr. Olson relied on detail men, medical conventions, medical journals and conversations with other doctors for information on drugs he was prescribing; that Dr. Olson was inundated with literature and product cards of various manufacturers; that a change in literature and an additional letter were insufficient to present new information to Dr. Olson; that detail men visit physicians at frequent intervals and could give an effective warning which would affirmatively notify the doctor of the dangerous side effects of chloroquine phosphate on the retina. These findings of fact were not clearly erroneous.

It is established in this record, as an uncontroverted fact, that the sale of chloroquine phosphate (and other prescription drugs) without a prescription is not permitted because of its potential to do harm unless its use is supervised by the prescribing practitioner, who should be made aware of its potential dangers. The uncontradicted evidence of appellee supports a finding that, during the relevant period, appellant's "detail man" Wilka, who introduced the drug to Dr. Olson in 1957 or in very early 1958, in a personal visit called on Dr. Olson regularly at four to six week intervals during the relevant period. The evidence was that Mr. Wilka called on Dr. Olson at his office regularly to promote the use of drugs sold by appellant. In these calls the "detail man" advised the doctor on the availability, nature and use of the drugs, and delivered various papers and literature, including current product cards, for the physician, Dr. Olson, to review, which Dr. Olson did review.

There is substantial evidence that this oral advice and literature, introducing the drug to Dr. Olson, contained the current knowledge of the side effects of the drug at the time of this introduction of the drug to Dr. Olson, but did not warn of the danger of irreversible retinal damage from prolonged use of the drug. Mr. Wilka, the "detail man", was not offered as a witness by either party, so his version of his instructions, duties and actions was not available at the trial.

### The Assignments of Error of Appellant

The contentions of appellant with respect to issues presented on this appeal, quoted above are founded on three assignments of error.

The first assignment is in substance that, in finding that appellant breached its duty to warn appellee's physician of the "possible side effects of Aralen", the trial court erroneously concluded that appellant was charged with a duty to warn "by the most effective method", rather than a duty to make reasonable efforts to warn appellee's doctor, the standard enunciated in the case of Sterling Drug, Inc. v. Cornish (C.A.8) 370 F.2d 82, l. c. 85. (The *Cornish* case which involved the same drug and a similar injury was decided in 1967 and was governed by Kansas law. The case was decided on general principles of cases from other jurisdictions in the absence of an applicable Kansas case.)

The second assignment of error is that the finding of the trial court that detail men "present the most effective method of warning the doctor" is unsupported by the evidence and clearly erroneous.

The third assignment of error is that the trial court erred in finding for appellant because appellant failed to make a "prima facie case" of failure to warn appellee's physician.

We find that there was no error in the trial court's findings of fact, conclusions of law and judgment for the appellee for the reasons stated hereinafter. Therefore, we rule the assignments of error against appellant, and affirm the judgment of the trial court.

### The Scope of Review

■ The scope of review in this tort action, based on alleged breach of duty by appellant, tried without a jury, is defined in the following authorities, among others: 5 Moore's Federal Practice ¶ 52.03[2] page 2631, ¶ 52.05[1] page 2647; 2B Barron & Holtzoff §§ 1130–1138; Wright, Federal Practice and Procedure (Rules Edition) ¶ 1137 page 563; Lewis v. Super Valu Stores, Inc. (C.A.8) 364 F.2d 555, l. c. 556, in which the rule was summarized by Chief Judge Van Oosterhout as follows:

"Rule 52(a), of the Federal Rules of Civil Procedure, clearly provides that findings made by a court in a case tried without a jury shall not be set aside unless clearly erroneous. Findings of fact can be set aside only upon a clear demonstration that they are without substantial evidentiary support or that they are induced by an erroneous view of the law."

This is essentially the scope of review asserted by appellant.

### The First Assignment of Error

Appellant contends that in this case the trial court adopted an erroneous view that the law required appellant to warn of dangers of the use of Aralen by the most effective method; that, there-fore, the ultimate determination of the fact that appellant breached a duty to warn by the most effective method (by detail men) was induced by application of an erroneous legal standard, a standard higher than the admitted duty to make reasonable efforts to warn. *Amicus curiae* supports appellant by a post-trial extra-record affidavit on the number of detail men on the detail force of 136 companies producing 90% of the output of prescription drugs in the United States. *Amicus curiae* argues that "the trial court has, in effect, asserted that a drug manufacturer should personally notify, by use of detail men, each of the nation's 248,000 physicians of new warning information on a prescription drug"; that this is an unreasonable duty.

This extra-record information is not all judicially noticeable, but will be assumed to be true for the purposes of this appeal, since it does not require reversal of the trial court.

We hold that appellant and *amicus curiae* have misconstrued the memorandum opinion of the trial court, and have taken out of context a portion of the memorandum dealing with the trial court's reasoning in the fact finding process of applying the standard of reasonableness. The trial court clearly applied, recognized and expressly enunciated the undisputed standard of a duty to make reasonable efforts to warn the medical profession of the side effects of the drug.

■ The trial court three times cited the *Cornish* case as enunciating the applicable standard. Memorandum opinions of this kind must be read as a whole. Parts thereof should not be read out of context. It is clear, in the context of the memorandum, that the trial court found as a fact that failure to make any effort to instruct its detail force, who promoted use of the drug, to warn the physicians, on whom they were calling, constituted failure to make reasonable efforts to warn the prescribing physicians. To find that reasonable efforts to warn would require appellant to

give this warning by detail men in the course of regular calls on physicians whom they had induced to use the drug is not either erroneous, or clearly erroneous, on the record of this case. Cf. Rederi A/B Soya v. S. S. Grand Grace (C.A.9) 369 F.2d 159, l. c. 163. Under the circumstances of this case, when the dangers of the prolonged use of this drug, mass produced and sold in large quantities, became reasonably apparent, it was not unreasonable to find that the appellant should have employed all its usual means of communication, including detail men, to warn the prescribing physicians of these dangers. In this connection it is noted that no extraordinary means of giving a warning of high intensity was employed.

■ This does not mean that every physician in the United States must have been given an immediate warning by a personal messenger. But it does mean that the trial court was justified in finding that it was unreasonable to fail to instruct the detail men, at least, to warn the physicians on whom they regularly called of the dangers of which appellant had learned, or in the exercise of reasonable care should have known. In none of the arguments of appellant, and of *amicus curiae*, and in none of the expert testimony offered by appellant is there an explanation of the reason the available detail men were not instructed to give such warnings in the course of their regular calls.

■ In this case the evidence strongly supports a finding that such failure to give such a warning to Dr. Olson resulted in his failure to prevent appellee's nearly total blindness.

An additional and independent reason exists to support the affirmance of the trial court. It is found in the testimony of the expert witness, Dr. Hazel, on industry custom of drug manufacturers in employing the "best method of acquainting the physician" with the dangers.

The offer of this evidence invited the trial court to consider whether the appellant had employed the best method, which is substantially the same as the most effective method. Cf. Restatement of the Law, Torts Second, § 295A.

■ Neither appellant nor *amicus curiae* questions the trial court's conclusion that the Restatement of the Law would be followed by the South Dakota courts in deciding the issue of appellant's liability. Nor is the applicability of § 402A of the Restatement of the Law, Torts Second, quoted in part by the trial court, challenged by either appellant or *amicus curiae*. Appellant does, however, rely on a part of the comment (n) of § 388. *Amicus curiae* comments that "it is strange that the trial court did not then consider Section 388 of the Restatement which makes a supplier liable for injury caused by his product where the supplier:

'(c) fails to exercise reasonable care to inform * * * of its dangerous condition or of the facts which make it likely to be dangerous.' "

*Amicus curiae* also quotes a part of comment (l) of § 388, stating that the supplier's duty is to exercise reasonable care to inform of the dangers of use of the article, and that the supplier is not subject to liability even if the information never reaches those for whose use the article is supplied. For the purposes of this case it can be assumed that both § 402A and § 388 are applicable to the facts of this case and are consistent. As applied to this case, the duty to warn is to use reasonable care to warn under the circumstances. This is the standard applied by the trial court.

The gist of the action in this case, under § 402A or § 388, is breach of the duty to give a proper (reasonable under the circumstances) warning resulting in injury to appellee. How this breach of duty is characterized or classified is unimportant in this case.[4]

4. Therefore, the failure of the trial court to rely expressly on § 388 is not error and is not prejudicial to the appellant. On the contrary application of the principles of § 388, contained in comment (n) thereof, may have given rise to a duty not

*Amicus curiae* cite 21 C.F.R. § 1.105 requiring information including side effects in advertising of prescription drugs, and § 1.106(b) (3) and (4) concerning directions for use of prescription drugs, but develop no argument from these regulations. None of these regulations supports appellant's contentions in this case. There is nothing in these regulations which affect the findings or conclusions of the trial court.

■■■ We conclude that where a drug is manufactured without negligence, but is unreasonably dangerous if a reasonable warning of a side effect is not given, that the manufacturer may be held liable for the injury resulting from the failure to give a warning reasonable under the circumstances.

### The Second Assignment of Error

■■■ In its second assignment of error, appellant contends that the finding that detail men present the most effective method of warning the doctor is clearly erroneous. Appellant recognizes this finding as truly a finding of fact subject to reversal only if it is clearly erroneous. We hold that it is not clearly erroneous. There was substantial evidence to support the finding. On this record a reasoning mind could soundly conclude that the finding is proved by a preponderance of the evidence.

Some of the evidence which warrants this inference is as follows: Appellant chose the method of personal calls by detail men, armed with special experience, training and literature, to promote the sale and use of its drugs.

It can be inferred that this method was chosen because it was the most effective method of presenting the nature and beneficial effects of appellant's drugs. A reasoning mind could find that this method would also be the most effective way of presenting the dangers of this drug and methods of preventing injury from the use of the drug. Appellant provided for fairly frequent personal calls by detail man Wilka on appellee's physician. The detail force of appellant was continuously in being and employment in the Sioux Falls area during the relevant period. Had the detail man Wilka been furnished a summary of the published literature on chloroquine at least in the years 1963 and the first three-quarters of 1964, with instructions to acquaint all physicians called on with the irreversible dangers of prolonged use of the drug and the methods of preventing injury from its use, a reasonable and effective warning could have been given by Wilka to appellee's physician (and all other physicians visited by detail men during the relevant period could have been given such a warning).

For these reasons, among others, we conclude that the finding in question was not clearly erroneous.

### The Third Assignment of Error

What has been ruled on the first two assignments of error makes it unnecessary to discuss at length the third assignment of error. This assignment is that appellant is entitled to a reversal because the evidence establishes that appellant made reasonable efforts to warn by the mailing of the warning letter, by

only to warn the prescribing physician but also to use a method of warning which "gives a reasonable assurance that the information will reach those whose safety depends on their having it." Under § 388 the reasonableness of the method depends on the magnitude of the risk, that is, the "serious character of the harm likely to result." § 291 Restatement of the Law, Torts Second, 54. The chloroquine retinopathy in this and other reported cases could well be found *to be very serious, and is certainly not trivial.* Cf. § 293 Restatement of the

Law, Torts Second, 58. The findings of damages in similar reported cases make this evident. See Sterling Drug, Inc. v. Cornish, *supra*; Krug v. Sterling Drug, Inc. (Mo.) 416 S.W.2d 143; Bine v. Sterling Drug, Inc. (Mo.) ,422 S.W.2d 623. Therefore, appellant was not prejudiced by determinations of its liability under § 402A. Cf. Davis v. Wyeth Laboratories (C.A. 9) 399 F.2d 121; 19 Southwestern Law Journal, 5-94; 1967 Wash.U.Law Quarterly 206; 19 Rutgers L.Rev. 702.

publishing information in the Physicians' Desk Reference, by making available product cards, and by its willingness to answer the inquiries of physicians. Curiously, appellant also relies on the existence of articles in drug publications and medical journals to which Dr. Olson subscribed, containing information at variance with the contemporaneously published information of appellant.

■ The trial court properly concluded that any failure of the appellee's physician to learn of warnings from sources other than appellant did not relieve appellant of liability. Sterling Drug, Inc. v. Cornish (C.A.8) 370 F.2d 82, 1. c. 85.

On the issue of breach of appellant's duty to use reasonable efforts to warn, there is no overwhelming proof of discharge of this duty. On the contrary a reasoning trier of the facts could find, on substantial evidence, that the methods of warning chosen by the appellant, including the product cards, the Physicians' Desk Reference, the "Dear Doctor" letter, and the willingness to answer inquiries were not reasonable efforts to warn under the circumstances of this case.

The "Dear Doctor" letter could have been reasonably found to be lacking in emphasis, timeliness and attention inviting qualities. A reasoning mind could find that appellant's warning actions were unduly delayed, reluctant and lacking in a sense of urgency, and therefore unreasonable under the circumstances. While a warning in February 1963 in an attention inviting letter would probably have been timely in this case if promptly received and heeded by appellee's physician, it could be inferred that a reasonably earlier warning, with greater intensity could well have reached appellee's physician directly, or indirectly through other professional channels such as conversations with other doctors and discussions at conventions. The delay in issuance of the "Dear Doctor" letter from August 1962 to February 1963, its wording, and the manner of its circulation could be found unreasonable considering the magnitude of the risk involved. Cf. Restatement of the Law, Torts Second, § 291, 54 and 55. The trier of the fact could reasonably conclude that the urgency of the circumstances reasonably required more than the relatively slow action and relative lack of emphasis employed in composing and circulating the "Dear Doctor" letter. The longer the warning was delayed the greater the risk became. Further Dr. Rice, former Director of Medical Research of appellant, offered as an expert witness, could give no explanation of the failure to send the letter by registered or certified mail. Everything said above about the letter applies with greater force to the Physicians' Desk Reference notices, which were really advertisements, and which were not published at all in the 1962 volume.

Appellant argues that the "unrebutted" testimony of its expert, Dr. Hazel (given without objection), that appellant's warnings were about "the most practical way of calling these matters to the profession's attentions" entitles it to a judgment. We disagree because (1) this contention is inconsistent with § 295A of the Restatement of the Law, Torts Second, 62, and (2) because Dr. Hazel testified that the custom of the manufacturer is to make what "in most part the medical profession and official control agencies of the drug industry feel, is the best method of acquainting the physician with these dangers." Section 295A of the Restatement does not support appellant's contention. This section is as follows:

> "In determining whether conduct is negligent, the customs of the community, or of others under like circumstances, are factors to be taken into account, but are not controlling where a reasonable man would not follow them."

■ Further, the expert testimony of Dr. Hazel, to say the least, was subject to evaluation by the trier of the facts. It might be given credit in part or given no credit. Accepting the view that the "best method" should be em-

ployed, the trial court could reasonably find that "the most effective method" was the best method and therefore should have been employed in a reasonable effort to warn under industry custom. Dr. Hazel's testimony was not binding on the trial court even if there had been no conflicting expert testimony. There was, however, conflicting expert testimony by physicians that it was impossible to read all the drug literature received by a physician and practice medicine. Consequently, a reasoning mind could find as a fact that appellant's methods of warning were not reasonable efforts nor "the best methods" in the judgment of the medical profession and official control agencies of the drug industry referred to by Dr. Hazel.

### Conclusion

None of the assignments of error are supported by the record in this case.

Acceptance herein of appellant's contentions concerning the scope of review and the applicable standard of conduct make it unnecessary to discuss the many other authorities cited by appellant and *amicus curiae*.

The judgment of the trial court is affirmed.