Diana SULLIVAN, Wife and Roger
Sullivan, Husband, Appellants,

v.

METHODIST HOSPITALS OF DALLAS,
d/b/a McAllen Methodist Hospital and
Alberto Francis, M.D., Appellees.

No. 13–84–357–CV.

Court of Appeals of Texas,
Corpus Christi.

Sept. 30, 1985.

Rehearing Denied Oct. 24, 1985.

Donald W. Allee, Edinburg, for appellants.

Lisa Powell, David Hockema, McAllen, William J. McCarthy, Leo C. Salzman, Harlingen, for appellees.

Before KENNEDY, UTTER and SEERDEN, JJ.

## OPINION

KENNEDY, Justice.

This is a medical malpractice case. Appellants sued appellees for injuries incurred when a sponge was left in her abdomen following a cesarean section. The jury found appellees not negligent. We reverse and remand.

Appellants, by their first point of error, complain that the trial court erred in denying appellant's special issues concurring *res ipsa loquitur.*

The application of *res ipsa loquitur* in medical malpractice cases is governed by TEX.REV.CIV.STAT.ANN. art 4590i Sec. 7.01 (Vernon Supp.1985) which provides:

> The common-law doctrine of *res ipsa loquitur* shall only apply to health care liability claims against health care providers or physicians in those cases to which it has been applied by the appellate courts of this state as of the effective date of this subchapter.

The effective date of the Medical Liability and Insurance Improvement Act of Texas, including Subchapter 6, was August 29, 1977.

The threshold question, therefore, is whether or not the doctrine of *res ipsa loquitur* is applicable to medical malpractice cases. Section 7.01 of Article 4590i appears to attempt to greatly restrict usage of the common-law doctrine of *res ipsa loquitur* to situations in which it was applied to Texas Health Care Providers prior to August 29, 1977. At common-law, *res ipsa* permitted a finding of negligence by the jury in limited instances, without expert testimony. The three factors necessary for application of *res ipsa* are: (1) that the nature of the event is such that it would not ordinarily happen absent negligence, (2) that the defendant had sole management and control of the instrumentality causing the injury and (3) that the plaintiff had not contributed to his own injury. *Mobile Chemical Co. v. Bell*, 517 S.W.2d 245 (Tex.1974); Perdue, *res ipsa loquitur: Applicability to Malpractice Cases in Texas*, 10 Tex.Tech.L.Rev. 371 (1979). In *Southwest Texas Methodist Hospital v. Mills*, 535 S.W.2d 27 (Tex.Civ. App.—Tyler 1976, writ ref'd n.r.e.), the court explained the application of res ipsa:

> [T]he doctrine of *res ipsa loquitur* springs from the very practical process of drawing logical conclusions from circumstantial evidence. Its purpose is to permit one who suffers injury from something under the control of another which ordinarily would not cause the injury except for the other's negligence, to present his grievance to the court or jury on the basis of the reasonable inferences to be drawn from such facts, even

though he may be unable to present direct evidence of the other's negligence.

*Res ipsa* has seldom been applied to medical malpractice cases in Texas for the reason that when the doctrine combines with the question of medical negligence it frequently raises complex issues beyond the common knowledge of laymen. However, we believe that Texas courts had held prior to 1977, that in certain circumstances, the plaintiff need not prove that the doctor's diagnosis was negligence and the proximate cause of plaintiff's injuries. This holding has specifically been applied to circumstances involving the leaving of surgical instruments or supplies inside the body of a patient. *Dobbins v. Garner*, 377 S.W.2d 665 (Tex.Civ.App.—Houston 1964, writ ref'd n.r.e.). Texas courts have recognized the theory that, under certain circumstances, a physician's negligent acts may be within the common knowledge of ordinary laymen. *See Roberson v. Factor*, 583 S.W.2d 818 (Tex.Civ.App.—Dallas 1979, writ ref'd n.r.e.); *Pekar v. St. Luke's Episcopal Hospital*, 570 S.W.2d 147 (Tex.Civ.App.—Waco 1978, writ ref'd n.r.e.); *Williford v. Banowsky*, 563 S.W.2d 702 (Tex.Civ.App.—Eastland 1978, writ ref'd n.r.e.); *Irick v. Andrew*, 545 S.W.2d 557 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.); *Rayner v. John Buist Chester Hospital*, 526 S.W.2d 637 (Tex.Civ.App.—Waco 1975, writ ref'd n.r.e.). *Goodnight v. Phillips*, 418 S.W.2d 862 (Tex.Civ.App.—Texarkana 1967, writ ref'd n.r.e.).[1]

■ The exact interpretation and effect of Section 7.01 is not abundantly clear from a reading of the statute. Obviously, had the legislature intended to do away with the doctrine of *res ipsa loquitor*, it would have done so simply by repudiating its application altogether in medical malpractice cases. However, since the legislature did not abolish the doctrine, by implication the theory ought to be allowed in cases in which it was "applied" prior to the act.

We therefore hold that the doctrine of *res ipsa loquitur* is applicable to the type of medical malpractice alleged by appellant in this cause. However, we do not sustain appellant's first point of error for the following reasons.

The record in this cause indicates that special issues were submitted to the jury concerning the alleged negligence of all the appellees. This was the controlling issue raised by the appellants' pleadings and the appellants' evidence. TEX.R.CIV.P. 277 only requires the trial court to submit the controlling issues to the jury and additionally gives the trial court considerable discretion in the submission of the issues.

■ Under the factual circumstances of this case, an additional issue on *res ipsa loquitur* would merely have been evidentiary of the question of the appellees' negligence, a question already before the jury. "In Texas it is well settled that *res ipsa loquitur* is simply a rule of evidence whereby negligence may be inferred...." *Mobile Chemical Co. v. Bell*, 517 S.W.2d 245 (Tex.1974). *See Jones v. Tarrant Utility Co.*, 638 S.W.2d 862 (Tex.1982). The real purpose of the doctrine is to allow the plaintiff to prove negligence by circumstantial evidence where it is impossible for the plaintiff to determine the sequence of events which caused the injury. *Jones v. Tarrant Utility Co.*, 638 S.W.2d 862 (Tex. 1982); *See Sweeny v. Erving*, 228 U.S. 233, 33 S.Ct. 416, 57 L.Ed. 815 (1913). Here we had direct evidence of the appellees' acts which were allegedly negligent. There was simply no necessity to submit the *res ipsa loquitur* issue in this case. *Nevauex v. Park Place Hospital, Inc.*, 656 S.W.2d 923 (Tex.App.—Beaumont 1983, writ ref'd n.r.e.). Appellants' first point of error is overruled.

By their fourth, fifth and sixth points of error, appellants complain of the legal and

1. For a general overview of this subject, *see* Perdue, *Law of Texas Medical Malpractice, 2nd Edition* 22 Hous.L.Rev. 203 (1985); Keith, *The Texas Medical Liability and Insurance Act—A Survey and Analysis of its History, Construction and Constitutionality*, 36 Baylor L.Rev. 265, 295 (1984); Perdue, *res ispa loquitur: Applicability to Malpractice Cases in Texas*, 10 Tex.Tech.L. Rev. 371 (1979).

factual sufficiency of the evidence to support the jury's failure to find that appellee, Methodist Hospital of Dallas, was negligent, that appellee, Dr. Francis, was negligent and that the scrub nurse and circulating nurse were borrowed employees of Dr. Francis. In considering a "no evidence" or "insufficient evidence" point of error, we will follow the well established test set forth in *Glover v. Texas General Indemnity Co.*, 619 S.W.2d 400 (Tex.1981); *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965); *Allied Finance Co. v. Garza*, 626 S.W.2d 120 (Tex.App.—Corpus Christi 1981, writ ref'd n.r.e.); CALVERT, *No Evidence and Insufficient Evidence Points of Error*, 38 Tex.L.Rev. 361 (1960). Therefore, an extensive review of the evidence is in order.

## DIANA SULLIVAN

Appellant, Diana Sullivan, testified that she had been in the hospital three times in her life, once for the birth of each of her two children and once to have surgery to remove a sponge. Diana was never ill as a child and, except for a minor injury requiring stitches, she had never been to a physician or dentist. When she was pregnant with her first child, Diana went to see a physician recommended by her aunt. Diana's first child was delivered by cesarean section. She stayed in the hospital five days and then went to her mother's house for two weeks.

When Diana was pregnant with her second child, she returned to the same group of physicians and was assigned to appellee, Dr. Francis. Dr. Francis told Diana that the second child would also be delivered by cesarean section. The delivery and a tubal ligation were scheduled for February 6, 1981.

On the night of February 4, Diana's water broke and her husband rushed her to Methodist Hospital, appellee in this case. The drive to the hospital took approximately 30 minutes. Diana was placed in a wheel chair for 10 to 15 minutes and then transferred to surgery. Diana had no labor pains. She was given a spinal and prepped for normal delivery. Diana had

not been instructed in how to deliver normally. When she inquired why she was prepped for a normal delivery instead of a cesarean, she was told the baby was near delivery.

Diana was then put to sleep and the next thing she knew, she had a baby boy delivered by cesarean. Diana was in the hospital five days and only recalled seeing Dr. Francis on the day he dismissed her. Two other physicians from the group visited her and one told her she was a bit anemic. When he released her, Dr. Francis prescribed iron pills for the anemia.

After her release from the hospital, Diana stayed with her mother for two weeks. Shortly after her dismissal from the hospital, Diana returned to Dr. Francis' office to have her stitches removed. Another appointment was scheduled for March. Diana was given an appointment card with the date and time of the appointment.

During the March appointment, Diana complained to Dr. Francis of a pain on her "right-hand side." Dr. Francis gave her a pelvic examination, checked the incision and stated to Diana that everything seemed fine. Dr. Francis attributed the pain in her side to the tubal ligation and told her to give it some time.

No further appointment was scheduled and no medication was prescribed. During May and June, Diana tried to call Dr. Francis and was unable to speak to him. She did not leave any message for him.

During the summer of 1981, the pain in Diana's right side increased, she had temperatures of 101 or 102, was depressed and "didn't want to do anything." Even though she was not dieting, Diana lost weight and stopped breast feeding her son.

Although she was taking aspirin every four hours, her pain was not relieved. Diana was constantly putting her hand against her side to help relieve the pain. During this time, she was unable to care for her children, cook or clean, or have sexual relations with her husband. She did not dress during the day, but remained in her nightgown. Diana did not return to

work as she had done after bearing her first child. She did, however, do some work for the family business. Diana's mother came over daily to help with the housework, care for the children and cook.

Diana and Roger began to argue and Roger started drinking and staying away from the house.

In August, an acquaintance of Diana and Roger, Joe Cantu, came by the Sullivan home. After seeing Diana, Cantu told Roger that Diana looked unwell. Roger talked Diana into going to the doctor.

Diana returned to Dr. Francis on August 20, 1981. Dr. Francis did a pelvic exam, took a Pap smear and checked the incision. He then stated that everything seemed fine, and told her to return the next day with a urine sample. After the analysis, Dr. Francis called Diana, said she had a "urine infection" and called in a prescription for her.

The medication did not help the pain, so she called Dr. Francis again and asked for more pills. He refused. She said that she was still in pain and had fever. Dr. Francis stated that "it has nothing to do with what I did, and I would recommend that you see your family physician. It could be your appendix." Diana had no family physician at that time.

About a week later, Diana felt a ball the size of an orange in her side. After waiting a week, Diana called her mother and was referred to Dr. Mestas.

On a Friday, Diana went to see Dr. Mestas. He told her she had a "tumor mass." She was told to return the next day for X-rays. The following day X-rays were made. Dr. Mestas sent Diana with an X-ray to Methodist Hospital to meet Dr. Francis. She called Roger and asked him to meet her at the hospital.

At the hospital, Dr. Francis examined the X-ray and told Diana that she had a tumor. He asked for more X-rays. By this time, Roger had arrived.

After examining the further X-rays, Dr. Francis again discussed the tumor with Diana and Roger. Roger asked if it could be anything else other than a tumor. Upon further examination of the X-rays, Dr. Francis told appellants, "I am crushed, there has been a sponge left ..." Dr. Francis suggested immediate surgery. Diana refused because she had to make arrangements for the care of her children.

Upon returning home, appellants decided they did not want Dr. Francis to operate on Diana and received a reference from friends for a Dr. Biddle. Arrangements were made for Dr. Biddle to remove the sponge on Monday.

Diana remembers awaking on Tuesday with a foul smelling drain in her side, an I.V. in her arm, fever and pain. She remained in the hospital for ten to twelve days and then stayed a week with her mother. Diana's mother helped care for Diana: cleaning the drain, bandaging it and taping it down.

Diana's small children were cared for by relatives while she was in the hospital and had a difficult time readjusting to her. Although Diana and Roger were able to resume sexual relations four to six weeks after the sponge was removed, their marital relationship has continued to suffer.

### ROGER SULLIVAN

Appellant Roger Sullivan testified that, on the night their second child was born, he took Diana to the hospital. It was twenty or twenty-five minutes from the time Diana's water burst until they arrived at the hospital. Diana stayed in the hospital for a week or ten days after the child was born, then Roger took Diana to her mother's house. She stayed there for about two weeks. After the second child, Diana "never bounced back ... She seemed tired or more worn out or more drained or whatever. I guess you could say that she never bounced back like she did with the first child." During this time, Roger and Diana had marital problems.

In August of 1981, Joe Cantu came to visit Roger, and, upon seeing Diana, told Roger she looked ill. Following this incident, Roger insisted Diana go to the doctor.

Roger didn't remember if Diana took any medicine at that time. After Diana was told by Dr. Francis that "any complaints she had didn't have nothing to do with him," Diana went to see Dr. Mestas. Roger did not accompany Diana.

When Diana came back home from Dr. Mestas' office, she was visibly upset and told Roger that she had a tumor. Roger did not go with Diana when she returned to Dr. Mestas the next day. Rather, he stayed home and mowed the grass. Diana left about 8:00 or 8:30 a.m. Around noon, Diana called from Dr. Mestas' office and asked Roger to meet her at the emergency room. She did not tell Roger what was wrong with her. Roger agreed to do so and then "went back to mowing the yard for a little while." Then, Roger called Dr. Mestas' office to tell Diana that he had decided not to go to the hospital. A lady in Dr. Mestas' office told Roger that he should go to the hospital, because "they had left something inside her from the c-section...."

When Roger arrived at the hospital, Diana was in a cubicle and Dr. Francis was there, together with a nurse "walking in and out." Diana was sitting on an examining table in a hospital gown. Dr. Francis was there and told Roger and Diana that "where he had done the c-section, where the baby was removed, there was a tumor found and that he was sorry but when he had done the c-section, he should have found it." Roger was embarrassed because he knew from his call to Dr. Mestas' office that it was a foreign body left from the cesarean.

Roger told Dr. Francis that they would like another opinion, and Dr. Francis "started telling us what I considered two or three scare stories." Dr. Francis stated that the operating room was being readied and that any delay could be dangerous to her health. Roger inquired if it could have been "that you left something inside of her instead of it being a tumor?"

Dr. Francis agreed to double check then left for two or three minutes. Upon his return, Dr. Francis said "that he was crushed," that obviously a sponge was left in Diana from the cesarean that Dr. Francis had performed. Dr. Francis did not show Roger any X-rays or discuss them with Roger. Dr. Francis stated that it was of the utmost importance that the surgery be performed right away, but Diana protested that she had to arrange for the care of their children. Roger and Diana told Dr. Francis that they "would get back with him."

Upon returning home, Diana and Roger decided that they did not want Dr. Francis to operate on Diana. They sought the advice of friends and obtained a reference to Dr. Biddle.

Diana entered the hospital on Sunday. The sponge was removed on Monday. On Monday, Diana had an I.V. in her arm and a foul-smelling drain from her abdomen. Diana stayed in the hospital for over a week. Then went to her mother's house.

After six weeks to two months, the Sullivan household returned to normal, and Diana and Roger resumed sexual relations. However, Roger and Diana still have marital problems.

## DR. FRANCIS

Appellee Dr. Francis was called as an adverse witness. He testified that he had been employed by the Sullivans to deliver their second child. The delivery was intended to be cesarean.

Diana was admitted to the delivery room at 11:40 p.m. Dr. Francis arrived at 12:05 a.m. Diana was in advanced labor and dilated eight centimeters. She had been prepped for a cesarean section. About 1:00 a.m., however, Dr. Francis decided to "give her a trial of a vaginal delivery." Diana was given a spinal. He found that the baby's head was occiput posteior, that is, facing up instead of down.

By this time the complete operating team had arrived, and Dr. Francis decided to go ahead with the cesarean. Diana was repositioned on the table, redraped and prepped for the cesarean, now on emergency basis.

Diana was placed under general anesthesia. Dr. Francis made his incision, placed a sponge on either side of the uterus, opened the uterus and delivered the baby. The baby was transferred to the care of the pediatrician. Dr. Francis then repaired a tear in the cervix, did a tubal ligation and closed the incision.

Dr. Francis testified regarding the responsibilities of the various members of the surgical team. The pediatrician is responsible for the baby and leaves with it as soon as it is born. The anesthetist is responsible only for the anesthesia.

Actually involved in the operation were Dr. Francis, the assistant surgeon, the scrub nurse and the circulating nurse. Dr. Francis testified that his responsibilities were not "well defined as just the welfare of the mother and the baby ...," but conceded that he was responsible for performing the cesarean. The assistant was there to help Dr. Francis "to retract and to make things easier for me. That's all." The assistant surgeon worked under Dr. Francis' direction.

The scrub nurse becomes sterile, remains in the sterile area of the operating room and assists the surgeon by handing him instruments. The circulating nurse is not sterile, remains outside the sterile area and brings things into the operating room from outside as required. Both nurses are employees of the hospital and neither was selected by Dr. Francis.

The nurses are responsible for making the sponge count. It is standard procedure for sponge counts to be given, the doctor need not ask for it. For a cesarean, the nurses normally do three counts. The three counts are done, first, .before the surgery begins, second, when the uterus is closed, and third, when the peritoneum is closed and when the skin is closed.

The Operative Report for Diana's cesarean was introduced showing that the sponge and needle counts were correct. The report was signed by Dr. Francis. In addition, the report stated "then the packs were removed." Dr. Francis admitted that the report was not correct.

Dr. Francis further testified as follows:

Q: Okay. Doctor, who on the surgical team is in overall control of the operation?

A: No one.

Q: No one?

A: No one particular person....

Later, Dr. Francis stated that it was his responsibility to remove the sponge from the abdomen. In other operations, Dr. Francis puts a clamp on sponges as a "tag," but "[i]t is not possible to do that on a cesarean because of the location where you have to put the packs in."

## DR. MESTAS

Dr. Mestas, the physician who found the sponge in Diana, testified that it is the doctor's responsibility to remove the sponges from the patient's body and to check the abdomen to see if any sponges are there. Usually, there are only two sponges used in a cesarean. According to Dr. Mestas, if a physician had inspected the abdomen of Diana, he would have found the sponge.

Dr. Mestas, when doing surgery, does a complete examination of the abdomen and then relies upon the nurses' count. If the nurse reports that the count is incorrect, the doctor looks for the sponge and, then if not found, orders an X-ray.[2]

Dr. Mestas also testified as follows:

Q: Doctor, in the operating room, who is in charge of the operative procedures?

A: The surgeon.

Q: The surgeon is in charge?

A: Yes.

Q: And, who's in charge of the nurses?

A: The Chief of the surgeon's nurse.

Q: Okay. And who in the operating room tells the different people what to do concerning the operating procedures?

A: The surgeon.

2. Sponges have a tape sewn into them which is designed to show up on X-rays.

Q: The surgeon who's performing the surgery?

A: Yes.

### CAROLYN CARROLL

Carolyn Carroll was called as an adverse witness by appellant. She is a registered nurse in the State of Texas. Nurse Carroll was the circulating nurse during Diana's cesearean. Nurse Carroll testified that, as circulating nurse, she was responsible for counting the sponges used in the operation.

Nurse Carroll testified regarding procedure for counting sponges. The sponges are taken out of packages and placed on a sterile table along with other supplies and equipment. The sponges are counted before the surgery begins, then again as the uterus is closed, again as the peritoneum is closed and again as the skin is closed for a total of four counts.

Normally, the surgeon does not request a sponge count or question it if the count is reported correct. The nurses are required, under the rules of the hospital to make the sponge counts.

### ROSA LINDA TOBIAS

Nurse Tobias is a registered nurse who assisted Dr. Biddle as circulating nurse during the operation to remove the sponge from Diana's abdomen. She completed the operating room record showing the sponge count in that operation.

In preparing for a case, the nurses open drapes, instruments and sponges, and sutures needed for the operation. She testified that the doctor is in charge of the surgery but that a number of things are done under hospital policies and without direction from the doctor including the sponge count.

### DR. BIDDLE

Dr. Biddle, the surgeon who removed the sponge from Diana, was called by the attorneys for Dr. Francis. He testified as to the details of how a cesarean is performed and how the sponges are placed. He then testified that it is sometimes difficult to locate a sponge during this procedure and that he relies upon the count of the nurses to determine if the sponges are all out. When he receives a correct count, Dr. Biddle closes.

Dr. Biddle further testified that, given the location of the sponge, it would probably not be seen by the surgeon. A surgeon normally will not count the sponges because he might impair his sterility.

### CAROLYN CARROLL

Nurse Carroll was recalled by appellee Hospital to testify on its behalf.

Nurse Carroll testified that the hospital records showed Diana was admitted to the labor unit at 11:40 p.m. on February 4, 1981, and to the O.B. Nursing Unit at 11:50. Nurse Carroll further testified that the nurses' labor room notes showed Diana was admitted to the labor room at 11:40, that the notes indicated that Diana was prepped for a cesarean. At 12:05 a.m., according to the report, contractions were three minutes apart and of forty seconds duration and Dr. Francis had arrived.

Diana also signed a consent for transfusion at 11:45 and a consent to operate at 12:20.

At 12:30 Diana received the drug Atropine, which dries the patient's mouth and is routinely given to all patients going in for surgery.

A page in the record marked "physician's orders" shows that at 11:45 Dr. Francis ordered Diana prepped for a cesarean, ordered routine lab work, an I.V. and Atropine, over the phone.

At 12:45, Diana was given a spinal and the natural delivery was attempted. By 12:55 the vaginal delivery was abandoned. The incision was made at 1:08 and the child was delivered at 1:13. At 2:05, Diana's incision was closed and she was transferred to recovery.

Nurse Carroll was recalled by appellee Hospital to testify on its behalf. She testified that four sponge counts were made, the primary count and then three counts

while closing. The primary count is usually made before the patient comes into the room. The counts are made by the scrub nurse and the circulating nurse.

Nurse Carroll confirmed the testimony of Dr. Francis that the scrub nurse is sterile and hands instruments, sponges and sutures to the doctor. The circulating nurse is not sterile and assists in seeing that everything needed for the operation is available. The circulating nurse counts the dirty or contaminated sponges. These sponges are placed in a basin on the floor by the scrub nurse or the doctor. The scrub nurse counts the sterile sponges. Each nurse watches the other perform her count. The total should equal the primary count.

On the occasion of Diana's cesarean, Nurse Carroll testified that all three sponge counts were correct. However, she admits that the count must have been wrong.

Nurse Carroll attempted to explain the incorrect count. On the night of the cesarean, she was "on call." She received the request to come in to work. When she arrived, she changed, then she and the scrub nurse started to set up. This included opening a "pack" for the cesarean. When Diana was brought into the operating room, Diana appeared to be in labor. Dr. Francis arrived and told Nurse Carroll that a vaginal delivery would be attempted. A pack for vaginal delivery was opened, Diana was given a spinal and prepped for the vaginal delivery. Forceps and sponges were prepared. Dr. Francis then decided to perform the cesarean. Diana was repositioned on the table, prepped for the cesarean, washed and draped and given a general anesthesia.

"Nurse Carroll testified that she *does not know* what happened to the equipment used to attempt the vaginal delivery, but that she *believes* that one of the sponges or some of the sponges were dropped on the floor when we switched over from the vaginal delivery to a real operation, a cesarean section."

The "switch" took five or ten minutes.

Nurse Carroll further testified that it is the nurses' responsibility to count the sponges and that the doctor relies on that count.

Nurse Carroll on cross-examination testified that a sponge which had fallen on the floor during the switch would not be soaked in blood or water. She *could not remember* a sponge like that and *could not remember* a sponge on the floor.

Nurse Carroll further testified that a "correct count" meant a count which agreed with the primary count, or in this case fifteen sponges. When, in fact, at least sixteen sponges were in the operating room.

She further testified that the scrub nurse was responsible for counting the sponges in the abdomen, but that the scrub nurse does not look inside the incision and actually see the sponges.

Nurse Carroll testified that, during Diana's operation, she recorded the sponge counts on "a piece of scrap paper" and that she never transcribed the record onto the operating room record.

■ Nurse Carroll's hypothesis regarding the extra sponge is only a supposition or speculation and does not even amount to a scintilla of evidence. *Jasper-Newton Electric Coop, Inc. v. Martin,* 647 S.W.2d 59 (Tex.App.—Beaumont 1983, writ ref'd n.r.e.). We therefore find that the jury's failure to find that the nurses' incorrect count was negligence is so against the great weight and preponderance of the evidence as to be manifestly wrong. *See Ford Motor Co. v. Nowak,* 638 S.W.2d 582 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.).

■ Appellant's fourth and fifth points of error are sustained. Appellant's sixth point of error is overruled; however, the entire case is remanded because only clearly separable issues may be severed. Tex.R.Civ.P. 434. The doctrine of comparative negligence requires reversal and new trial as to all multiple defendants in an action for damages, even though error has

been found only as to one. *Kenneally v. Thurn,* 653 S.W.2d 69 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.).

Appellants, by their eighth through twelfth points of error, complain of the trial court's granting of appellees' partial directed verdict and denial of appellants' special issues. Appellants complain of the failure to submit issues on the following:

(8) Dr. Francis' failure to adequately examine Diana Sullivan and properly diagnose the cause of Diana Sullivan's continued pain, weight loss, fever and malaise;

(9) Dr. Francis' failure to order X-rays of his patient, Diana Sullivan;

(10) Dr. Francis' failure to disclose to his patient Diana Sullivan, immediately upon so learning, that a sponge had been left in her abdomen;

(11) Dr. Francis' abandonment of his patient Diana Sullivan;

(12) Exemplary damages.

■ We find that the points designated (11) and (12) were not supported in Plaintiffs' First Amended Petition and that leave to file Plaintiffs' First Amended Supplemental Petition, which did contain these points, was not granted by the trial court.

Appellants' eleventh and twelfth points of error are overruled.

Appellants' points (8) through (10) were supported by Plaintiffs' First Amended Petition and are governed by the standards of directed verdicts and denial of special issues.

■ A physician's failure to diagnose a condition and inform the patient of that condition constitutes a cause of action. *Lloyd v. Ray,* 606 S.W.2d 545 (Tex.Civ.App. —San Antonio 1980, writ ref'd n.r.e.); *Rose v. Friddell,* 423 S.W.2d 658 (Tex.Civ.App.— Tyler 1967, writ ref'd n.r.e.).

■ In determining whether a directed verdict should be affirmed, we must determine whether there is any evidence of probative force to raise fact issues on the material questions presented. *Henderson v. Travelers Insurance Co.,* 544 S.W.2d

649, 650 (Tex.1976); *Hernandez v. Southern Pacific Transportation Co.,* 641 S.W.2d 947 (Tex.Civ.App.—Corpus Christi 1982, no writ). The test for submitting issues to the jury is the same as that for instructing a verdict. The Trial Court cannot refuse to submit an issue merely because an affirmative finding regarding that issue would be against the great weight and preponderance of the evidence. *Verette v. Travelers Indemnity Co.,* 645 S.W.2d 652 (Tex.App.—San Antonio 1982, no writ). In a case where an instructed verdict has been rendered, it is the task of the reviewing court to determine whether the record contains any evidence of probative force raising fact issues on material questions presented, considering all of the evidence in the light most favorable to the party against whom the instructed verdict was rendered and discarding all contrary evidence and inferences. *Kennedy v. Beasley,* 606 S.W.2d 1 (Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.)

■ Appellees assert that the testimony of Dr. Mestas was insufficient to establish the standard of care for Dr. Francis. We disagree. We believe that the combined testimony of Drs. Francis, Biddle and Mestas was sufficient to establish a standard of care for the jury's guidance. Whether Dr. Francis met that standard was a question for the jury. *Snow v. Bond,* 438 S.W.2d 549 (Tex.1969).

In addition, appellee Dr. Francis asserts that the acts or omissions subsequent to the surgery could not have proximately caused any injury. Dr. Francis argues that there is no showing that the alleged misdiagnosis caused any injury, citing *Glenn v. Prestegord,* 456 S.W.2d 901 (Tex.1970). In *Glenn v. Prestegord,* the court held that in order for a patient to recover for a failure to diagnose, a plaintiff must show that some additional injury occurred. We find that appellants presented some evidence of mental anguish and additional physical suffering which resulted from Dr. Francis' failure to properly diagnose and inform Diana of the presence of a sponge in her abdomen. Diana testified

that she feared that she would be told that she had cancer, that this was her greatest fear. Diana's mother had cancer in 1976 and had to be treated in Houston. Diana visited her mother in Houston. Diana further testified that Dr. Mestas told her she had a "tumor mass" on Friday, that Dr. Francis told her that she had a tumor. Taken in the light most favorable to appellants, this testimony of mental anguish and increased physical suffering caused by these actions is sufficient to take this case out of the *Glenn v. Prestegord* Rule and show additional injury.

Appellee Dr. Francis, in his brief, states that there is "no credible evidence that Dr. Francis attempted to conceal Ms. Sullivan's condition." We note that the credibility of the witnesses is uniquely in the province of the fact finder and does not rest with this Court or the trial court. Appellants were denied the opportunity to present this evidence to the jury.

Appellant's eighth, ninth and tenth points of error are sustained.

Appellants, in their remaining points of error, complained of (2) jury misconduct, (3) improper jury argument, (7) the legal and factual insufficiency of the evidence to support the jury finding that Diana failed to seek medical attention, (13) the introduction of a record not produced during discovery and (14) permitting Dr. Biddle to testify.

Because of our disposition of the prior points, these points are not necessary to the disposition of the appeal and will not be addressed. TEX.R.CIV.P. 451.

The judgment of the trial court is reversed and remanded.

Opinion ordered published.

Tex.R.Civ.P. 452.