Tommy and Martha
KISSINGER, Appellants,

v.

R.J. TURNER, III, M.D., Robert J.
Turner, III, M.D., P.A., and Saint
Joseph Hospital, Appellees.

No. 2–85–286–CV.

Court of Appeals of Texas,
Fort Worth.

March 19, 1987.

Rehearing Denied April 30, 1987.

Hooper & Evans, and Winfred Hooper and Vickie Rainwater, Fort Worth, for appellants.

Shannon, Gracey, Ratliff & Miller, and D. Michael Wallach and Robert D. Frye, Fort Worth, for R.J. Turner, III, M.D. and Robert J. Turner, III, P.A.

Cantey, Hanger, Gooch, Munn & Collins, and Richard L. Griffith, Stephen L. Tatum and M. Beth Krugler, Fort Worth, for St. Joseph Hosp.

Before FENDER, C.J., and BURDOCK and HILL, JJ.

## OPINION

HILL, Justice.

Tommy and Martha Kissinger appeal from a take nothing judgment which they received in their action for medical malpractice, following trial by jury. The action was brought due to a surgical clamp being left in Tommy's abdomen during surgery. They present six points of error.

We affirm.

In points of error numbers one, two, and three, the Kissingers urge that the trial court erred in overruling their motion for new trial because the jury's failure to find negligence on the part of Dr. R.J. Turner, III, one of the appellees herein, or on the part of Rand Podell, C.S.T., Linda Henderson, C.S.T., and/or B. Tucker, R.N., in the failure to remove the clamp from Tommy's abdomen, was so contrary to the great weight and preponderance of the evidence as to be manifestly unjust.

In point of error number four, the Kissingers assert that the trial court erred in overruling their motion for new trial because the failure of the jury to find that Saint Joseph Hospital was negligent in failing to prescribe adequate policies and procedures designed to prevent the leaving of the clamp was so contrary to the great weight and preponderance of the evidence as to be manifestly unjust.

The Kissingers present in point of error number five their argument that the trial court erred in not granting their motion for judgment non obstante veredicto or their motion to disregard findings on special issues, because the defendants were negli-

gent as a matter of law in failing to remove the clamp.

If an appellant is attacking the legal sufficiency of an adverse finding to a special issue on which he had the burden of proof, the Supreme Court of Texas has stated that the appellant must, as a matter of law, overcome two hurdles. *See Holley v. Watts*, 629 S.W.2d 694, 696 (Tex.1982). First, the record must be examined for evidence that supports the finding, while ignoring all evidence to the contrary. *Id.* If there is no evidence to support the fact finder's answer, then secondly, the entire record must be examined to see if the contrary proposition is established as a matter of law. *Id.*

■ In reviewing a point of error asserting that a finding is "against the great weight and preponderance" of the evidence, we must consider and weigh all of the evidence, both the evidence which tends to prove the existence of a vital fact as well as evidence which tends to disprove its existence. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986) (per curiam); *Ford Motor Co. v. Nowak*, 638 S.W.2d 582, 585 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.). So considering the evidence, if a jury finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the point should be sustained, regardless of whether there is some evidence to support it. *Watson v. Prewitt*, 159 Tex. 305, 320 S.W.2d 815, 816 (1959) (per curiam); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951) (per curiam).

Tommy Kissinger was suffering from liver disease, probably cirrhosis caused by alcohol consumption, prior to being brought to the emergency room of Saint Joseph Hospital on February 14, 1983. When he was brought into Saint Joseph, he had vomited blood and was evidently bleeding from his digestive tract. Kissinger's internist determined that surgical intervention was necessary in order to save Kissinger's life. After stabilizing Kissinger's condition, Dr. Turner performed a portacaval shunt operation on February 28, 1983. The purpose of the operation was to stop the bleeding by reducing the pressure in the veins where the bleeding was occurring.

The operation was difficult. Dr. Turner testified that when he opened Kissinger's abdomen it looked like somebody had poured a bucket of glue inside. He said that in his twenty years of surgery and experience in performing such operations that he had never seen the tissues and organs in the abdominal cavity so deteriorated.

Because of the unusual condition of Tommy's abdominal cavity, there was an abnormal amount of internal bleeding during the course of the operation. At one point, while working to control bleeding in the pelvic area, severe arterial bleeding occurred in the upper operative field. Dr. Turner had to stop working on the pelvis immediately so as to stop the arterial bleeding. He and his assistant, Rand Podell, both theorized that it is possible that at that point the Kelly clamp could have slipped under a loop of intestine.

Tommy went home after the operation. He was recovering from the operation until April 13, 1983, when he began to vomit and suffer abdominal pain. When he lapsed into a coma, his family brought him to the Saint Joseph Hospital emergency room shortly after midnight. Noting that Tommy responded to pain or pressure, Dr. Turner ordered an X ray of his abdomen. The X ray revealed that a surgical clamp, known as a Kelly clamp, was present in Tommy's abdomen, under the small intestine.

Dr. Francis Jackson, the plaintiff's expert on portacaval shunts, testified that on February 28, 1983, the day of Kissinger's surgery, the universal standard of care required that no foreign objects be left behind inside any body cavity, unless intended to be left behind, and that the retention of the Kelly clamp in Kissinger's abdomen fell below that standard of care. In order

to prevent such occurrences, Dr. Jackson stated that the universal standard of care prescribes the following precautionary measures:

(1) The surgeon should remember where he puts an instrument inside the patient.

(2) The operative field should be inspected visually and by means of manual palpation which would necessarily reveal the presence of the clamp.

(3) An instrument count should be performed by the nursing staff. The scrub nurse is responsible for bringing together all the instruments to be used in the surgery, to keep them readily available to the surgeon, and to make sure that those instruments are returned at the end of the operation. If an accounting method is used, the circulating nurse assists the scrub nurse in this procedure.

(4) Radiopaque objects should be used, which are detectable by X rays.

(5) An X ray should be taken to make sure that no instruments are left behind.

In the instant case, at the end of the operation, there was a count of sponges and a count of sharps, which includes needles and knife blades, but no count was made of instruments. Chest X rays, but not abdominal X rays, were taken.

Dr. Jackson also testified that the universal standard of care requires that in major, life-threatening operations, the first assistant at the operating table be a trained physician. He said that another surgeon would have the concept of the procedure, the expertise, and possibly the memory of what was going on during the surgery and would be a secondary check. In the instant case, Dr. Turner employed Rand Podell, a surgical technician, to assist him in Kissinger's surgery. Dr. Jackson stated that he was not familiar with the local standard of care as to the use of non-physician assistants in the Dallas-Fort Worth area. Dr. Jackson admitted that these preventive procedures were not infallible and that sometimes an instrument could still be left behind, that he never recommended an instrument count when he was chief of surgery at Lubbock General Hospital, and that

postoperative X rays are not universal but are only performed in special instances. He also admitted that the Joint Accreditation Commission, which is responsible for accreditation of hospitals, has not required an instrument count, automatic postoperative X rays or the presence of assisting physicians for accreditation purposes.

According to Claudia Crooks, administrative director of nursing at Harris Hospital, who testified as to the role of the scrub nurse and the circulating nurse in the operating room, the first assistant does not have to be an M.D. Reading from the nursing training manual called Berry & Kahn, *Introduction to Operating Room Technique,* she stated that instrument counts are recommended but that some hospitals only prescribe instrument counts when a major body cavity is entered or when "the depth and the location of the wound is such that an instrument could accidently be left in the patient," including surgery to the abdominal and pelvic cavities. She stated that the procedures that were developed by a committee she helped establish were adopted by Harris Hospital, and that these procedures are general knowledge in the medical community. These procedures require that an instrument count be performed during abdominal surgery. She stated that these procedures are based on ordinary care and are in conformity with the standard of care for counting instruments in the United States as shown by the recommendations and procedures adopted by the Association of Operating Room Nurses. She admitted, however, that an instrument can be left behind even though an instrument count is taken and that not all the suggested guidelines promulgated by either the Association of Operating Room Nurses or the Berry & Kahn's manual have been implemented at Harris Hospital.

Dr. Dewey Johnston testified that the setting, monitoring and enforcement of professional standards at St. Joseph Hospital is done by the medical staff. On February 28, 1983, St. Joseph Hospital had specific procedures for sharp and sponge counts but not for instrument counts, nor

did St. Joseph have a mandatory postoperative X ray policy.

Victoria Gotich, a registered nurse, testified that she had been working at All Saints Hospital and at Huguley Hospital, both Tarrant County hospitals, and that neither had an instrument count policy.

Suzanne Gottschalk, one of the scrub nurses during Kissinger's surgery, testified that if she had remained in the operating room throughout the entire surgery, she would only have counted the sponges and the sharps.

Glenda Hatton, acting director of the operating room at St. Joseph Hospital, testified that St. Joseph has a hospital policy manual, an operating room policy manual, and an operating room procedure manual. She also stated that the hospital does a yearly inventory but that there is neither an actual count of the instruments or a way of accounting for the instruments in and out of the surgical suite.

Dr. Robert J. Turner, who was chief of surgery at St. Joseph Hospital and member of the hospital's surgical policy committee at the time of Kissinger's surgery, testified that he had performed 25 to 50 similar interventions and that in the average case no instrument count is performed. He speculated that the Kelly clamp must have slipped under the abdominal wall and down into the pelvis when his attention was diverted to the upper abdomen to control more extensive bleeding. He stated that he felt around in the abdomen but that he did not feel the clamp, and that if he had, he would have removed it. He stated that there is no numerical accounting for the instruments as for sponges, sharps and lap packs and that, therefore, there is no documented or numerical accounting for Kelly clamps used in the operation and that he did not request abdominal X rays. Dr. Turner stated that he does not believe that counts are infallible since in many foreign object cases a correct count was performed. He also thinks that counts are time consuming and are seldom productive because of the possibility of human error, and that the audible counting interferes with the surgeon's concentration. He also

stated that while he knew that on February 28, 1983, Harris Hospital had an instrument count policy, to the best of his knowledge it was not a standard of care in hospitals in Tarrant County to either count hemostats or to automatically take X rays whenever Kelly hemostats were used. According to his understanding of the standard of care as it existed in Tarrant County, Texas on February 28, 1983, there was no deviation or departure from the standard of care by any of the hospital personnel that assisted him during the surgery, and that they did everything that was required of them by hospital policy. He stated that to the best of his knowledge St. Joseph Hospital followed the standard of care of other hospitals in this community and that the absence of a policy to take postoperative X rays was not a deviation from the standard of hospital care that existed in February of 1983.

Dr. Turner further testified that even though he was not aware that Harris Hospital counted instruments until 1983, he was familiar with the medical staff policies of Harris Hospital as a member of Harris Hospital's courtesy staff. He also stated that he never made any recommendations to St. Joseph as to instrument counts, and that he was not responsible for reading recommendations put out by the American Operating Room Nurses Association.

Rand J. Podell, the surgical technician who assisted Dr. Turner during Kissinger's surgery, testified that it is a universal objective of all operating room personnel and surgical teams to avoid leaving foreign objects inside the abdomen of a patient and that it is essentially the job of the scrub nurse to keep up with the instruments. He stated that usually Dr. Turner goes into the abdomen and feels around, that Dr. Turner and he looked inside the operative field, but that they did not go back down in the lower quadrant because they were afraid that bleeding might start again. Mr. Podell stated that usually surgical technicians are used to assist the surgeon and that the only time two surgeons operate together is during open-heart surgery.

Podell testified that in order to become a surgical technician, the only requirement, besides taking a written examination, is to be a graduate of an approved operating room technician course and that it was not necessary to have a period of practical training, but that during the one year course he was allowed to observe and participate in surgical operations. He did not remember whether any kind of count was taken during the surgery. He stated that since they might have used more than 100 clamps, it was very possible that a clamp could have slipped under a loop of intestine and that because the adhesions were so dense in that area that it was overlooked by Dr. Turner, the nurses and himself and that this could have happened in spite of good medical and operative procedures. Podell said that it was necessary, in order to remove the Kelly clamp during the second surgery, to dig deep into the pelvis in order to find the clamp.

Linda Henderson, who is a surgical technician in Fort Worth, testified that she used to work at Harris Hospital for four years as a scrub nurse and that she routinely performed instrument counts in abdominal surgery because such instrument counts were hospital policy. She said that she assisted during Kissinger's surgery as a scrub nurse, and tried to keep up with the instruments, but that she did not make an instrument count, did not receive any assistance in keeping up with the instruments, and did not notify the surgeon as to any missing instruments.

In its charge, the trial court asked the jury if, from a preponderance of the evidence, the failure to remove the Kelly clamp was due to negligence. The jury answered "we do not" as to all defendants. The trial court also asked the jury if Saint Joseph Hospital had been negligent in failing to prescribe adequate policies and procedures designed to prevent leaving the Kelly hemostat in Kissinger's body. The jury also answered this special issue "we do not."

■ We find that the evidence does not establish that the defendants were negligent as a matter of law. We further find that the jury's findings as to all defendants are not so contrary to the great weight and preponderance of the evidence as to be manifestly unjust.

■ The Kissingers' argument is based on the supposition that the evidence conclusively established that the standard of care is not to leave instruments in the body and, since an instrument was left in the body of the patient, that the defendants are necessarily negligent. We believe that it is possible from the evidence for the jury to determine that the standard of care relates not to the happening of an undesired result, the leaving of an instrument in the body, but is instead related to those actions which are reasonably required to avoid the undesirable result. The Kissingers correctly assert that the custom or practice in a given area is not conclusive on the issue of the standard of care. *See Webb v. Jorns,* 488 S.W.2d 407 (Tex.1972). In typical negligence cases, however, custom is some evidence of the standard of care. *Leadon v. Kimbrough Brothers Lumber Company,* 484 S.W.2d 567, 569 (Tex.1972). We see no reason for a different rule in medical malpractice cases; we hold that evidence of the custom of medical care, while not conclusive, is some evidence of the standard of care. *See* Perdue, *Medical Malpractice,* 1 STATE BAR OF TEXAS ADVANCED PERSONAL INJURY LAW COURSE D–1, D–23 (1986).

■ The Kissingers acknowledge the fact that in Texas, medical malpractice cases involving the leaving of foreign objects in the body invoke the doctrine of *res ipsa loquitur,* which means that expert testimony is not required, as it would ordinarily be in other types of medical malpractice, in order for one's case to be submitted to the fact finder. We hold that the leaving of a foreign object in a body during surgery does not necessarily constitute negligence as a matter of law. In such cases the requirement of medical testimony is eliminated but the necessity of proof of negligence remains. *See Martin v. Petta,* 694 S.W.2d 233, 239 (Tex.App.—Fort Worth 1985, writ ref'd n.r.e.).

The evidence shows a medical team dealing with an unusual and difficult surgery. The jury could have determined that the clamp was left in Tommy's body, despite the use of accepted procedures for avoiding such a mishap, due to the difficulty of the operation and the unusual condition of the operating field.

The Kissingers, in oral argument, refer us to the case of *Sullivan v. Methodist Hospitals of Dallas*, 699 S.W.2d 265 (Tex. App.—Corpus Christi 1985), *writ ref'd n.r.e. per curiam*, 714 S.W.2d 302 (Tex. 1986). The *Sullivan* case involved a routine caesarean section procedure of relatively brief duration in which a sponge was left in the patient. The jury failed to find either the doctor, the nurses, or the hospital negligent. The court held that the jury's failure to find the nurses negligent for miscounting the sponges was so against the great weight and preponderance of the evidence as to be manifestly wrong. The court did not make such a finding either as to the doctor or the hospital. We find the factual difference between *Sullivan*, which involved a relatively brief and uncomplicated operation in which a sponge was left in due to a faulty sponge count, and the case at bar, which involved a very lengthy and difficult procedure in which the clamp was apparently left in due to the difficulty of the operation and the unusual condition of the operating field, as we have previously described, to be so great as to make *Sullivan* inapplicable here. We overrule point of error numbers one through five.

In point of error number six, the Kissingers assert that the trial court erred in refusing to allow into evidence the federal regulation which requires that, for a hospital to be eligible for Medicare or Medicaid participation, the first assistant in major operations must be a qualified surgeon. Kissinger was not a Medicare or Medicaid patient. No showing was made which would establish as a matter of law that the Medicare-Medicaid regulations establish a standard of care for medical practice generally. In fact, Dr. Jackson, the sponsoring witness, testified that aside from the mere fact of the Medicare-Medicaid regulation, that there was no standard of care for a hospital surgical procedure violated by St. Joseph Hospital in allowing Dr. Turner to conduct a portacaval shunt procedure with the use of a nonphysician assistant. We therefore hold that the trial court did not err in refusing to admit the Medicare-Medicaid regulation into evidence. We overrule point of error number six.

The judgment is affirmed.