No. 57,368

EMIL E. JOHNSON, *Appellee*, v. AMERICAN CYANAMID COMPANY and
LEDERLE LABORATORIES, *et al., Appellants.*

(718 P.2d 1318)

Opinion filed
May 19, 1986.

*Donald R. Newkirk,* of Fleeson, Gooing, Coulson & Kitch, of Wichita, argued the cause, and *Susan P. Selvidge* and *David G. Seely,* of the same firm, and *Larry Wall,* of Stratton, Russell, Toomey & Wall, of Wichita, were with him on the briefs for appellants.

*Gerald L. Michaud,* of Michaud, Cordry, Michaud, Hutton & Hutton, of Wichita, argued the cause, and *Mark B. Hutton,* of the same firm, and *Dwight A. Corrin,* of Corrin & Krysl, Chartered, of Wichita; *Jerry W. Hannah,* of Hamilton

and Hannah, of Topeka; and *William S. Bowers*, of Ottawa, were with him on the brief for appellee.

*Wayne T. Stratton* and *Charles R. Hay*, of Goodell, Stratton, Edmonds & Palmer, of Topeka, were on the *amicus curiae* brief for the Kansas Medical Society.

*Gerald W. Gorman* and *John A. Vering III*, of Dietrich, Davis, Dicus, Rowlands, Schmitt & Gorman, of Kansas City, Missouri, and *Allen R. Slater*, of the same firm, of Olathe, were on the *amicus curiae* brief for American Academy of Family Physicians.

*Thomas Scarlett*, chief counsel, and *Ann H. Wion*, associate chief counsel for Drugs & Biologics, Food & Drug Administration, of Rockville, Maryland; *Gene W. Matthews*, legal advisor to Center for Disease Control, of Atlanta, Georgia; *Benjamin Burgess*, United States attorney; *Richard K. Willard*, acting assistant attorney general; *Robert L. Willmore*, deputy assistant attorney general; and *John F. Cordes* and *Mark B. Stern*, attorneys, Department of Justice, of Washington, D.C., were on the *amicus curiae* brief for the United States of America.

*Robert L. Howard*, of Foulston, Siefkin, Powers & Eberhardt, of Wichita, and *Donald R. Harris* and *Richard L. Verkler*, of Jenner & Block, of Chicago, Illinois, were on the *amicus curiae* brief for the American Academy of Pediatrics.

*Daniel F. Sullivan*, of Daniel F. Sullivan & Associates, of Seattle, Washington, was on the *amicus curiae* brief for Jonas E. Salk, M.D., and Darrell J. Salk, M.D.

*Jerry I. Meyers*, of Berger, Kapetan, Malakoff & Meyers, of Pittsburgh, Pennsylvania, was on the *amicus curiae* brief for Concerned Scientists and Citizens.

The opinion of the court was delivered by

McFARLAND, J.: Emil E. Johnson brought this personal injury action alleging he had contracted poliomyelitis as a result of his infant daughter having been vaccinated by defendant physician, Vernon Branson, utilizing Orimune, an oral polio vaccine manufactured by Lederle Laboratories (a division of defendant American Cyanamid Company). Henceforth in the opinion, the manufacturer of the vaccine will be referred to as American Cyanamid. The jury was instructed on comparison of fault as between the two defendants (no issue of fault was submitted as to the plaintiff). The jury assessed 100% of fault against defendant American Cyanamid and awarded $2,000,000.00 actual damages and $8,000,000.00 punitive damages. American Cyanamid appeals from the judgment against it but specifically does not appeal from the jury's finding of zero fault on the part of defendant Branson.

## FACTS RELATIVE TO PLAINTIFF'S ILLNESS

On September 26, 1975, plaintiff took his infant daughter Laurie to the child's pediatrician, Dr. Vernon Branson, where

Orimune, an oral polio vaccine manufactured by American Cyanamid, was administered to her. The sequence of polio vaccination was completed by additional administration of the same vaccine by the same physician on November 24, 1975, and January 14, 1976. In December of 1975 plaintiff became ill and was admitted to the University of Kansas Medical Center on December 9 where his illness was diagnosed as bulbar paralytic poliomyelitis. Plaintiff contends he is totally disabled as a result of the disease. At trial, it was contested whether or not Laurie's vaccination program was the cause of plaintiff's illness, but this is not an issue on appeal.

## HISTORY OF POLIO VACCINES

By virtue of the nature of claims of liability asserted against American Cyanamid, much of the evidence at trial concerned the history of the disease poliomyelitis and efforts to control the disease, namely, the development of vaccines and the federal government's efforts to vaccinate the public. Polio was first identified as a disease in the 19th century. Its occurrence became more frequent and in 1952 it claimed 57,897 victims in the United States alone. The federal government and private medical research facilities commenced an all-out effort to conquer the dreaded killer and crippler of so many children and adults. A major breakthrough occurred when Dr. Jonas Salk developed a killed or "inactivated" polio vaccine. This vaccine must be administered by injection. By 1955 the Salk vaccine was being distributed extensively in the United States and new cases of polio were reduced to less than 5,000 per year by 1959. In the late 1950's a new polio vaccine was developed by Dr. Albert Sabin and was widely tested in Europe. The Sabin vaccine is a live polio vaccine which contains greatly weakened or attenuated polio virus. The Sabin vaccine must be given orally.

Although the Salk vaccine had greatly reduced the incidence of polio, the disease remained a significant health threat and pressure was mounting for a federally funded immunization program to bring the disease under control and, it was hoped, eliminate it. By 1961, the bitter controversy was in full bloom as to which of the two types of vaccines—Sabin or Salk—should be the weapon used in the battle against the disease. At that time only the Salk vaccine was being produced in this country although the Sabin vaccine had been used very successfully in

Europe. The American Medical Association urged, in 1961, the use of the Sabin vaccine. The federal government solicited American drug firms to produce the Sabin vaccine. United States manufacturers of the Salk vaccine opposed the introduction of the Sabin vaccine. Three manufacturers agreed to manufacture the Sabin vaccine (including American Cyanamid). The Sabin vaccine rapidly replaced the Salk vaccine in the United States and no Salk vaccine has been manufactured in this country since 1968. American Cyanamid is the only United States firm manufacturing polio vaccine at the present time and it manufactures the Sabin type.

In the last twenty-five years the Sabin v. Salk controversy has rolled on unabated. The minority Salk supporters, spearheaded mainly by Dr. Salk himself, have never ceased to advocate the superiority of the Salk vaccine in the numerous forums involving federal public health officials. The Sabin supporters include all major public and private health organizations and assert Sabin is the vaccine of choice. There are advantages to the Sabin vaccine. It is administered orally—usually on a sugar cube to individuals old enough to eat sugar cubes. The Salk vaccine can only be injected through a needle. The injections are time-consuming and require individual administration by trained medical personnel. Further, injections are less well received by poorly educated persons and resistance thereto is stronger. Additionally, there is substantial medical evidence that the immunity induced by the Sabin vaccine is longer lasting and does not require boosters as may be necessary with the Salk vaccine.

Ironically, the very cause of the longer-lasting immunity of the Sabin vaccine gives rise to the major drawback of this vaccine. The Sabin vaccine must be given orally, as the weakened virus gives immunity by proliferating in the intestines, thereby triggering the body's immune system. For reasons unknown, occasionally, but on a rather predictable ratio of incidence, the virus reproduced in the intestinal tract is a virulent virus, not the weakened Sabin virus. When this occurs, the individual receiving the virus, and persons in close contact with such individual, may acquire polio as a result of the vaccination. This unfortunate event occurs some five to ten times each year in the United States. This risk from the Sabin vaccine has been there from the

beginning of its usage. It is a known risk and has been argued at every phase in the long-standing Salk-Sabin controversy.

The very ability of the Sabin vaccine to infest others is, in the broad public health view, a plus factor. Unlike the Salk vaccine, the Sabin vaccine can vaccinate persons in contact with vaccinated persons because the intestines secrete the virus. Usually, the virus so secreted is the same weakened type as was used in the vaccine. Hence, such individuals are vaccinated without actual medical vaccinations. From a public health standpoint, more people can be so vaccinated than could otherwise be reached. Kansas requires polio vaccination before children are admitted to elementary school or state licensed child care centers or preschools.

Being fully informed of this known risk, the federal government approved the Sabin vaccine and purchased large quantities of it for its mass public immunization program. The decision was made that the Sabin vaccine would be the weapon utilized to fight the serious public health problem of polio. The program has been so successful in reducing the incidence of "wild" polio that an individual in the United States now has about the same risk of contracting "wild" polio as he or she does of contracting polio through vaccination or contact with a vaccinee. Virtually all of the Western world utilizes the Sabin vaccine over the Salk vaccine in its public health programs. Finland, by virtue of a recent polio outbreak which included some individuals previously immunized by the Salk vaccine, is now using the Sabin vaccine in its public health program.

## MOTION TO DISMISS

The first issue before us originally arose on a motion, filed by defendant Branson, to dismiss the appeal (filed prior to the time the appeal was dismissed as to him). This motion was denied with leave to renew and was subsequently renewed by the plaintiff rather than Branson. The issue concerns the time sequences involved in the filing of the notice of appeal and the filing and hearing of certain post-trial motions as well as irregularities in the filing of the journal entry of judgment. Little would be gained in setting forth in this opinion the complex factual and procedural history involved. It is sufficient to state that we have carefully considered the plaintiff's allegations relative to his motion to dismiss and find the same to be without merit.

## ISSUES ON APPEAL

We turn now to the issues raised by defendant American Cyanamid in its appeal. Numerous errors relative to evidentiary rulings and the giving of instructions are asserted. We shall first consider a serious challenge made by American Cyanamid to the sufficiency of the evidence relative to its liability. Specifically, the appellant contends that the trial court erred in denying its motion for a directed verdict.

## DISCUSSION OF LIABILITY OF MANUFACTURER

One might well wonder why it is necessary to set forth the history of the development of polio vaccines in this opinion. Over American Cyanamid's objection, the Sabin-type vaccine, itself, was put on trial. Much of the evidence introduced herein could well bear the caption *Salk v. Sabin*. One of plaintiff's expert witnesses, Dr. Darrell Salk (son of the originator of the killed virus type of vaccine), testified the Salk-type vaccine was a far better product and the Sabin-type vaccine had no place in the health program of the United States. Time and again in this trial, the inference was made that manufacturing any Sabin-type vaccine was wrongful and the direct result of some nefarious conspiracy between the federal government and American Cyanamid to cripple and kill Americans. American Cyanamid was forced to defend the efficacy of the Sabin-type vaccine and introduce evidence of its overall superiority to the Salk-type vaccine. Faced with the type of evidence that was permitted to be introduced, American Cyanamid requested that, at least, the United States government should be made a phantom party for comparison of fault purposes (the request was denied).

The Sabin-type vaccine was the vaccine of choice recommended by all major health organizations in the United States in 1975. Its production by American Cyanamid was the result of the federal government's solicitation of the firm to manufacture the Sabin vaccine which public health authorities believed, based on a vast array of scientific literature, was necessary to combat a major health problem. The seed strains of virus utilized in the manufacture of the vaccine by American Cyanamid are supplied by the federal government and the vaccine's manufacture is closely monitored by the federal government.

Plaintiff acquired contact polio from his child, the vaccinee. The fact that this type of occurrence would happen on an extremely infrequent, but rather predictable, ratio was known from

the time Sabin-type vaccines were introduced. The remote risk of contact polio is inherent in the Sabin-type vaccine and cannot be eliminated. The risk could not be altered by a change in the manufacturing process. The phenomenon of contact polio was not newly discovered information acquired by American Cyanamid and hidden from public view. This is in sharp contrast to the factual situation present in the drug involved in *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, 681 P.2d 1038, *cert. denied* 469 U.S. 965 (1984). Plaintiff seeks to impose liability, in the first instance, on what is, in essence, a design defect theory. That is, that the Salk-type vaccine (a killed virus vaccine) is a better product and American Cyanamid should be held liable for producing a Sabin-type vaccine (live virus vaccine) rather than the Salk-type vaccine. Plaintiff is seeking to impose strict liability in tort based upon design defect (the inadequate warning claim of liability will be discussed later). Section 402A of the Restatement (Second) of Torts (1963) states:

§ 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

 (a) the seller is engaged in the business of selling such a product, and

 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

 (a) the seller has exercised all possible care in the preparation and sale of his product, and

 (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

Comment *k* to § 402A is significant to the issue before us:

"*k. Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. *Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it* unreasonably *dangerous.* The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and

opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The *seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.*" (Emphasis supplied.)

Orimune, the Sabin-type vaccine, is an "unavoidably unsafe product" that is an "apparently useful and desirable product, attended with a known but apparently reasonable risk" as a matter of law. Public policy requires that the mere manufacture of the vaccine not be actionable on the ground of design defect. The trial judge should have heard the evidence on this issue outside the presence of the jury and made the determination thereon. There is no claim that the vaccine administered to plaintiff's child was improperly manufactured or that a defective product was delivered. The vaccine was properly prepared and marketed and was exactly what it was intended to be. As a matter of law there is no manufacturing or design defect in the product at issue herein.

This leaves the only possible liability in the adequacy of the warning provided by the manufacturer.

In *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, previously cited, this court discusses the duty to warn relative to drugs. As in the case before us, the drug in *Wooderson* was sold to a physician who, in turn, prescribed/administered the drug to the patient. As recognized in *Wooderson*, under such circumstances the "learned intermediary" concept comes into play. The manufacturer's duty is to adequately warn the physician of a known risk.

In determining warning issues, the test is reasonableness. To impose liability on a manufacturer, the plaintiff must show negligence on the part of the manufacturer. In *Kearl v. Lederle Laboratories*,)172 Cal. App. 3d 812, 218 Cal. Rptr. 453 (1985) (a case also involving Orimune but where the vaccine was administered through a clinic rather than a learned intermediary), the applicable rules were stated as follows:

"As an initial matter we question the commonly assumed and often asserted proposition that in products liability cases failure to warn or inadequacy of a warning may be a basis for imposition of *strict liability*. A review of the cases

discloses that the analysis called for in this situation is not based on strict liability, but negligence.

"As noted above (*ante*, p. 822) the characteristic that distinguishes strict liability from negligence is proof of actual or constructive knowledge of risk: In a negligence action we focus on the defendant's conduct and require plaintiff to show defendant acted unreasonably in light of a known or constructively known risk. In strict liability actions, on the other hand, we focus not on the reasonableness of a defendant's conduct but on the product, and we either ignore the question of a manufacturer's actual or constructive knowledge of risk (as in a 'consumer expectations' design defect case) or we in effect impute to the manufacturer defendant current scientific knowledge of the risk caused by his product (as in a risk/benefit design defect balancing case). (See, e.g., Comment, *The Failure to Warn Defect; Strict Liability of the Prescription Drug Manufacturer in California* (1983) 17 U.S.F.L. Rev. 743, 755.) But in all warning cases—even if the plaintiff or the court claims to analyze failure to warn or inadequacy of warning in the context of a strict products liability claim—the tests actually applied condition imposition of liability on the defendant's having actually or constructively known of the risk that triggers the warning. (*E.g., Carmichael v. Reitz, supra,* 17 Cal. App. 3d 958, 988; *Christofferson v. Kaiser Foundation Hospitals, supra,* 15 Cal. App. 3d 75, 79-80; *Oakes v. E.I. Du Pont de Nemours & Co., Inc.* (1969) 272 Cal. App. 2d 645, 650-651, 77 Cal. Rptr. 709; *Toole v. Richardson-Merrell, Inc., supra,* 251 Cal. App. 2d 689, 709-710; *Dunn v. Lederle Laboratories, supra,* 328 N.W.2d 576, 580; *Woodill v. Parke Davis & Co., supra,* 402 N.E.2d 194, 197-198, and cases cited; *Petty v. United States, supra,* 740 F.2d 1428, 1432; *Reyes v. Wyeth Laboratories, supra,* 498 F.2d 1264, 1274-1275; *Basko v. Sterling Drug, Inc., supra,* 416 F.2d 417, 426; *Sterling Drug, Inc. v. Yarrow* (8th Cir. 1969) 408 F.2d 978, 992-993; *Davis v. Wyeth Laboratories, supra,* 399 F.2d 121, 129; Kidwell, *The Duty to Warn: A Description of the Model of Decision* (1975) 53 Tex. L. Rev. 1375, 1377-1378; Note, *supra,* 48 Fordham L. Rev. at pp. 745-750; Prosser & Keeton on Torts (5th ed. 1984) § 99, at p. 697; see also Comment, *Strict Liability and the Tortious Failure to Warn* (1984) 11 N. Ky. L. Rev. 409, 419-422 [criticizing but recognizing the present result].)

"Just as liability for failure to warn of product risk is based on negligence, the adequacy of a warning is also judged under a reasonableness standard—even if the claim is made under the rubric of a strict products liability 'defect.' (*Sterling Drug, Inc. v. Yarrow, supra,* 408 F.2d 978, 992-993; *Feldman v. Lederle Laboratories, supra,* 479 A.2d 374, 386 ['negligence and strict liability in warning cases may be deemed to be functional equivalents']; *Dunn v. Lederle Laboratories, supra,* 328 N.W.2d 576, 580; *Franklin & Mais, supra,* 65 Cal. L. Rev. at p. 762, and cases cited in fn. 33; Note, *supra,* 32 DePaul L. Rev. at p. 254, fn. 29; Kidwell, *supra,* 53 Tex. L. Rev. at pp. 1378-1379; Prosser & Keeton, *supra,* § 99, at p. 697; but see Noel, *Products Defective Because of Inadequate Directions or Warnings* (1969) 23 Sw. L.J. 256, 267, 272.)" 172 Cal. App. 3d at 831-33.

Was the warning adequate as a matter of law? That is, was it a reasonable warning by a manufacturer to a learned intermediary? Was the manufacturer negligent in the warning supplied?

The warning provided herein states:

**"ADVERSE REACTIONS**

"Individual patients have at times attributed symptoms or conditions to the vaccine by reason of time relationship, but these in general have been minor and apparently unrelated.

"Expert opinion is in agreement that the administration of live oral poliovirus vaccines is generally an effective and safe method of protecting populations against the natural disease. *Paralytic disease following the ingestion of live poliovirus vaccines has been reported in individuals receiving the vaccine, and in some instances, in persons who were in close contact with subjects who had been given live oral poliovirus vaccine.* Fortunately, *such occurrences are rare,* but considering the epidemiological evidence developed with respect to the total group of 'vaccine related cases' it is believed by some that at least some of the cases were caused by the vaccine.

"*The estimated risk of vaccine-induced paralytic disease occurring in vaccinees or those in close contact with vaccinees is extremely low. A total of approximately 30 of such cases were reported for the 8 year period covering 1963 to 1970, during which time about 147,000,000 doses of the vaccine were. distributed nationally. Even though this risk is low, it should always be a source of consideration.*" (Emphasis supplied.)

The warning obviously warns that in rare instances a person in close contact with a vaccinee may develop polio. This is exactly what happened to the plaintiff herein. This, then, is not a failure to warn question, but rather a question of the adequacy of the warning. *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, previously cited, although couched in terms of an "adequacy of warning" issue, actually involves a failure to warn, as the injury received by plaintiff was not included in the warning.

Plaintiff contends the first paragraph of the warning waters down the total warning. We do not believe so. It deals with what patients have reported rather than scientific fact. If a lay person takes a drug or receives a vaccine and two days later is suffering from an abscessed tooth, an attack of appendicitis, or whatever, he or she tends to link the two occurrences as cause and effect regardless of any medical connection. The paragraph leaves in the possibility some minor side effects reported by patients might be medically possible.

The balance of the warning clearly states the scientific fact that some persons in close contact with vaccinees may develop a paralytic disease from such contact. It is unnecessary to describe to a physician what paralytic disease is and the seriousness of it. The warning then states the chances of this happening are "extremely low." The figures of 30 cases in a particular eight-

year period during which time 147,000,000 doses were distributed are included. These figures are consistent with those provided in 1972 by the Public Health Service, and the Advisory Committee on Immunization Practices and were current in 1975 when the vaccine herein was administered.

Plaintiff did not challenge these figures directly, but his expert (Dr. Salk) stated they did not take into account the number of unused doses and the number of already vaccinated persons receiving new vaccinations. No figures for such categories are available so Dr. Salk estimated what percentage he thought should be deducted from the stated figures to get down to the actual risk. Assorted risk factors were testified to, such as .00002%, one in a million, etc. By any computation the risk was very low.

Plaintiff contends that the warning was also inadequate because it failed to state that individuals who were not immune to the disease were at greater risk than those who were immune. It hardly takes a medical degree to know that a person immune to a virus cannot acquire the disease. Later warnings spelled this out, but this is not evidence of negligence.

Plaintiff also argues that the warning was inadequate because it did not provide information on alternate vaccines. No Salk-type vaccine was being manufactured in the United States in 1975. Although unclear, there was evidence that a Salk vaccine might have been available at that time through a Canadian source. Sabin-type vaccines were the vaccines of choice and recommended at the time (1975) by all major health organizations involved therein. The general consensus was that the Sabin-type vaccine was superior to the Salk-type vaccine. American Cyanamid had no special knowledge or new information tending to refute this. Further, this is not a case where the drug manufacturer attempted to water down the warning by direct contact with physicians intending to lull the physicians into believing the stated risk was less than the required warning indicated (see *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387). The warning given herein had been approved by the Federal Drug Administration and was consistent with an overwhelming bulk of the current medical opinion.

We conclude that the trial court erred in denying American Cyanamid's motion for a directed verdict herein. As a matter of

law, there was no submissible theory of liability on the part of American Cyanamid. It is certainly unfortunate that plaintiff was the one in a million (or whatever the remote risk actually is) who developed the dreaded disease from contact with his vaccinated child, but there is no legal basis for a claim of negligence by American Cyanamid. The judgment against American Cyanamid must be reversed.

As a result of the determination that it was error for the trial court to submit the issue of liability of American Cyanamid to the jury, all other issues raised by American Cyanamid need not be determined.

## DISPOSITION

The sole remaining question is whether the reversal of the judgment against American Cyanamid ends the case or whether the case should be remanded for a new trial between plaintiff and defendant physician.

In *Turnbull v. Byram,* 235 Kan. 891, 684 P.2d 429 (1984), two vehicles collided at an intersection normally controlled by a traffic light. At the time of the accident the traffic signal was not operating. One driver (Turnbull) sued the other driver (Byram) for negligent operation of his vehicle and also sued the City of Hutchinson for negligence in its response to the inoperable traffic light. The jury assessed fault as follows: plaintiff driver—48%; defendant driver—17%; and defendant City—35%. On appeal this court determined the City was not negligent as a matter of law. This left the 35% fault assessed against the City dangling. If a new trial were not afforded the result would be to add the entire 35% to plaintiff's fault—yet the jury had already determined each driver was partially at fault. Upon retrial the jury might well redistribute the dangling 35% between the two remaining parties. In remanding the case back for retrial between the remaining parties, this court held:

"Where the jury finds a party to an action negligent and the record on appeal discloses as a matter of law that party is not negligent, the negligence of the remaining parties to the action must be redetermined by the factfinder and the percentages of fault of the remaining parties reassigned on retrial." Syl. ¶ 2.

There is a crucial distinction between *Turnbull* and the case before us. In *Turnbull* each of the defendants appealed from the judgment and all issues relative to their respective liability were before this court. In the case before us now, only American

Cyanamid appealed and its appeal was expressly limited to issues of plaintiff's judgment against it. As a note of explanation, American Cyanamid originally appealed from the entire verdict, but later specifically dismissed its appeal relative to the jury's finding that Dr. Branson had zero percentage of fault. There was no cross-appeal filed by the plaintiff herein. Does this court have any jurisdiction under these circumstances to remand the case for retrial of the issues between plaintiff and defendant Branson? We believe not. All issues between these two parties were fully litigated in the trial herein, and no party to the appeal claims any error in the trial of said issues.

The judgment against American Cyanamid is reversed.

PRAGER, J., dissenting: I respectfully dissent. By this decision, the majority has denied to the plaintiff his right to trial by jury and has substituted its judgment for that of the jury and the trial judge who heard the testimony of the witnesses and determined the case. I have no quarrel with the general principles of law stated in the majority opinion which govern the liability of a drug manufacturer. I agree that where a manufacturer produces a highly beneficial product which is unavoidably unsafe to certain users of the product, the rules set forth in comment *k* of § 402A of the Restatement (Second) of Torts (1963) should be applied in determining the manufacturer's liability.

Where a product creates a danger that cannot be eliminated, but its utility is so great that it should be manufactured without subjecting the manufacturer to strict liability, it may be marketed provided the user is made aware of the danger and is given the opportunity to make an informed decision whether to expose himself or herself to it. This principle is universally applied by the courts in such situations. The liability of the manufacturer in such cases is not based upon strict liability but is based upon the negligent failure to provide an adequate warning to an injured user of the product.

The law requires that the warning be communicated to the user of the product who may be injured by the use of the product. In situations where a product is sold and delivered to a treating physician, who then administers the product to the patient, the law requires that the manufacturer of the drug provide information and a sufficient warning to the physician who in turn is required to advise the patient or user of the drug of its dangers so

that the ultimate user may make an informed decision whether to expose himself or herself to it. In the present case, the evidence is undisputed that the defendant, Dr. Vernon L. Branson, the treating physician, never at any time conveyed to the plaintiff, Emil E. Johnson, any warning whatsoever that the use of Orimune by Mr. Johnson's daughter could transmit paralytic polio either to the child or to Mr. Johnson as the parent and custodian of the child. Both Dr. Branson and Mr. Johnson testified without equivocation that no warning was ever given by the doctor to Johnson.

The evidence was likewise undisputed that some information about the drug and a warning were given by the defendants, American Cyanamid Company and Lederle Laboratories, to Dr. Branson. The primary issue presented to the jury was whether or not the warning was adequate to inform Dr. Branson of the nature of the drug, its dangers, and the possibility of using less dangerous alternatives.

In determining this case, this court must first consider the nature and scope of the warning requirement in mass inoculation cases. In this regard, the cases generally agree that an adequate warning in mass inoculation cases requires that vaccinees be directly informed in clear and simple terms by the drug manufacturer of (1) the reasonably foreseeable risk inherent in the product; (2) reasonable available alternative products and the reasonably foreseeable risks posed by such alternatives; and perhaps—in appropriate cases—(3) the reasonably foreseeable results of remaining untreated. *Petty v. United States*, 740 F.2d 1428, 1436-37 (8th Cir. 1984) (adequacy of swine flu vaccine warnings); *Unthank v. United States*, 732 F.2d 1517, 1521 (10th Cir. 1984); Comment, *Informed Consent to Immunization: The Risks and Benefits of Individual Autonomy*, 65 Cal. L. Rev. 1286, 1295-99, 1307-11 (1977); see also *Cobbs v. Grant*, 8 Cal. 3d 229, 241-45, 104 Cal. Rptr. 505, 502 P.2d 1 (1972); *cf.*, Britain, *Product Honesty is the Best Policy: A Comparison of Doctors' and Manufacturers' Duty to Disclose Drug Risks and the Importance of Consumer Expectations in Determining Product Defect*, 79 Nw. U.L. Rev. 342 (1984).

This rule is recognized and applied in *Kearl v. Lederle Laboratories*, 172 Cal. App. 3d 812, 218 Cal. Rptr. 453 (1985), which the majority opinion quotes from in depth. In *Kearl*, the package

of OPV polio vaccine which was sold and delivered by Lederle to the doctor in 1978 contained a one-page warning insert which was described by the *Kearl* court as follows:

" 'IMPORTANT INFORMATION ABOUT POLIO AND POLIO VACCINE. *Please read this carefully.'* The information sheet briefly described polio, stated that the risk of contracting it is very low '[e]ven for someone who is not vaccinated,' and explained inter alia that oral live polio vaccine is *'one* of the best ways to prevent polio' in young children. (Italics added.) It provided: 'POSSIBLE SIDE EFFECTS FROM THE VACCINE: Oral live polio vaccine rarely produces side effects. *However, once in about every 4 million vaccinations, persons who have been vaccinated or who come in close contact with those who have recently been vaccinated are permanently crippled and may die.* Even though these risks are very low, they should be recognized. The risk of side effects from the vaccine must be balanced against the risk of the disease, both now and in the future.' (Italics added.) The information sheet suggested that pregnant women should consult a physician before taking the vaccine, and listed other persons who should not take the vaccine without consulting a doctor. It then informed the prospective vaccinee of the alternative vaccine: 'NOTE ON INJECTABLE (KILLED) POLIO VACCINE: Besides the oral polio vaccine, there is also a killed polio vaccine given by injection which protects against polio after several shots. *It has no known risk of causing paralysis.* Most polio experts do not feel it is as effective as the oral vaccine for controlling polio in the United States. It is recommended for persons needing polio vaccination who have low resistance to infections (or those who live with them) and for unprotected adults traveling to a place where polio is common. It is not widely used in this country at the present time, but it is available. If you would like to know more about this type of polio vaccine, please ask us.' (Italics added.)" pp. 818-19.

The court in *Kearl* considered this warning and held as a matter of law that it was an adequate warning, using the following language:

"As related above defendant directly warned plaintiff in plain and explicit terms about the risk of contracting polio from the vaccine. *It described the alternative vaccine, IPV, and stated that vaccine carried no risk of causing polio, that it was available, and that most polio experts feel it is not as effective as OPV in controlling polio nationwide—an objective statement of fact clearly borne out by the literature. The reader was specifically invited to inquire further about IPV and was generally invited to ask questions about polio and polio vaccination.* We conclude this warning adequately informed plaintiff of the reasonably foreseeable risks associated with OPV and with the alternative product, IPV." p. 834. (Emphasis supplied.)

Compare the warning in *Kearl* with the warning inserted in the package delivered to the physician, Dr. Branson, in the present case. It was as follows:

"ADVERSE REACTIONS
"Individual patients have at times attributed symptoms or conditions to the

vaccine by reason of time relationship, *but these in general have been minor and apparently unrelated.*

"Expert opinion is in agreement that the administration of live oral poliovirus vaccines is generally an effective and safe method of protecting populations against the natural disease. Paralytic disease following the ingestion of live poliovirus vaccines has been reported in individuals receiving the vaccine, and in some instances, in persons who were in close contact with subjects who had been given live oral poliovirus vaccine. Fortunately, such occurrences are rare, but considering the epidemiological evidence developed with respect to the total group of 'vaccine related cases' *it is believed by some that at least some of the cases were caused by the vaccine.*

"The estimated risk of vaccine-induced paralytic disease occurring in vaccinees or those in close contact with vaccinees is extremely low. A total of approximately 30 of such cases were reported for the 8 year period covering 1963 to 1970, during which time about 147,000,000 doses of the vaccine were distributed nationally. Even though this risk is low, it should always be a source of consideration." (Emphasis supplied.)

In considering the adequacy or inadequacy of the warning in this case, the language should be carefully analyzed. The first paragraph gives the impression that the symptoms or conditions suffered by patients from use of the vaccine have been minor and apparently unrelated. In paragraph two, although it is stated that paralytic disease following the ingestion of live poliovirus vaccines has been reported in individuals receiving the vaccine and in persons who were in close contact with persons who have been given oral vaccine, fortunately, such occurrences are rare, but it is believed by some that *some* of the cases were caused by the vaccines. This would indicate that the relationship between use of the live oral vaccine and paralysis suffered by patients or persons in contact with patients is questionable, because it is only believed by *some* that the cases were caused by the vaccines. This statement is contrary to the undisputed testimony of the defendants' experts which was presented at the trial.

One of defendants' experts, Dr. Vincent L. Fulginiti, testified by deposition that, as early as 1960, the manufacturers of the live polio vaccine knew that a certain number of people would get paralytic polio by coming in contact with a recipient of Orimune. In the present case, the vaccine was administered to plaintiff's daughter in 1975, fifteen years after the defendants became fully aware that the administration of Orimune could cause paralytic polio either to the user or to a person in close contact with a user. Would a reasonable person reading paragraph two of the insert

warning given in this case reach that conclusion from the subdued language used in paragraph two?

It seems to me that, from a reading of the warning given in this case, a reasonable person might conclude that the danger of total paralysis is not emphasized with the same intensity which is present in the warning which was found adequate in *Kearl v. Lederle Laboratories,* mentioned heretofore. It *must also be emphasized that the warning in the present case did not in any way convey to Dr. Branson the fact that there was a reasonably available alternative product and the reasonable risks posed by such alternative product.* This element of an adequate warning was considered as essential by the court in *Kearl.*

The majority opinion cites as authority *Wooderson v.Ortho Pharmaceutical Corp.,* 235 Kan. 387, 681 P.2d 1038, *cert. denied* 469 U.S. 965 (1984). The duty to warn is discussed on pages 399-411 of the *Wooderson* opinion. If we follow *Wooderson,* I do not believe that this court could hold that a reasonable person could not reach the conclusion that the warning given in this case was not adequate.

*Wooderson* stands for the following legal propositions:

(1) The manufacturer of ethical or prescription drugs has a duty to give timely and adequate warnings to the medical profession of any dangerous side effects produced by its drugs of which it knows, or has reason to know.

(2) The duty to warn must be commensurate with the seriousness of the danger. The greater the danger, the greater the duty.

(3) Although the duty of the ethical drug manufacturer is ordinarily to warn the doctor rather than the patient, the manufacturer is directly liable to the patient for a breach of such duty.

(4) In the case of drug manufacturers, the standard of constructive knowledge is that of an expert in that particular field.

(5) Because a manufacturer cannot be required to warn of a risk unknown to science, the knowledge chargeable to the manufacturer of an ethical drug must be limited to that of the period during which the plaintiff was using the product in question.

(6) The duty to warn is a continuous one, requiring the manufacturer to keep abreast of the current state of knowledge relevant to its products as gained through research, adverse reaction reports, scientific literature, and other available methods.

(7) An adequate warning is one reasonable under the circumstances.

In *Wooderson*, this court refused to hold that the warning was adequate as a matter of law and held that it was a jury question. We refused to substitute our judgment for that of the jury.

The law is clear that, in determining the adequacy of the warning on a dangerous product, the testimony of experts in the field should properly be considered. In this regard see *Siruta v. Hesston Corp.*, 232 Kan. 664, 659 P.2d 799 (1983). The rule is generally followed throughout this country that expert or opinion evidence is admissible to be considered by the jury in determining the adequacy of the warning provided by a manufacturer to a user of a product. See the annotation on the subject at 26 A.L.R. 4th 377.

Let us now consider the evidence presented in the record in this case which supports the plaintiff's position that the warning provided by the defendants, as manufacturers, was inadequate and did not satisfy the requirements of law discussed earlier in this dissent. The evidence was undisputed that Emil E. Johnson, who is now totally incapacitated by permanent paralysis of his upper trunk, was never given any warning whatsoever by anyone as to the dangers of Orimune or the alternative use of a less dangerous vaccine. As early as 1960, it was known that live polio vaccine will cause some persons to get paralytic polio. Despite this knowledge, American Cyanamid and Lederle Laboratories decided to manufacture Orimune and make it available to the medical profession. I have no quarrel with that decision, provided warnings were provided to the medical community to protect the patients and persons in contact with them.

The evidence was undisputed that on June 28, 1968, Dr. Russell F. Cahoon, an employee in Lederle's Medical Controls Branch, sent a memorandum to his superior, Dr. Eugene Swanzey, complaining that the warning contained in the package insert was not adequate. Dr. Cahoon suggested that all of the facts then known, which emphasized the risk involved, should be included in the package insert to advise the physicians, so that they could give proper warnings to their patients. Dr. Cahoon recognized that many prospective vaccinees or their relatives might be less likely to accept and receive the vaccine and this might reflect in reduced sales. Dr. Swanzey stated that he did not remember receiving the memorandum but, if he did, he threw it in the wastebasket. Dr. Swanzey did not see fit to

discuss it with his superiors. Why has the majority rejected this testimony as a matter of law?

Dr. Branson was called as a witness. He testified without equivocation that the 1975 insert involved in this case did not tell him enough. He testified that he would have liked to have known as a practicing physician that Lederle was expecting a certain number of contacts to get polio from the vaccine he was giving to his babies. If he had known about it, he would have passed the information on to Emil Johnson. He did not consider the warning adequate, because it was not made clear that the vaccine would cause paralytic disease. Dr. Branson testified that, since he has learned about the use of IPV vaccine, he has used it in his practice, and, if Lederle had told him about IPV vaccine in 1975, he would have done so then. Dr. Branson, a competent Kansas physician, clearly testified that the warning provided by the defendants was inadequate. Why has the majority rejected his testimony as a matter of law?

Dr. Branson called as a witness Dr. Russell A. Nelson, a board certified pediatrician and a professor of pediatrics at the KU Medical Center. Dr. Nelson testified that if he had been adequately informed of the dangers of the live vaccine, the existence of the safe alternative Salk killed vaccine, and the fact that the killed vaccine was available to protect a vaccinee's family, he would have passed that information on to Mr. Johnson, who was getting his daughter vaccinated. He felt that if he had had knowledge about the Salk killed vaccine, he would have given Mr. Johnson the opportunity to use either one. A reading of Dr. Nelson's testimony could lead a reasonable person to the conclusion that the warning contained in the 1975 insert was not sufficient to advise a pediatrician of the danger involved in using live polio vaccine or of the other less dangerous alternative vaccine available. Why has the majority rejected his testimony as a matter of law?

Dr. Darrell J. Salk, a pediatrician on the faculty at the University of Washington, was called as a witness in the case by the plaintiff. His father is Jonas Salk, one of the developers of the inactivated killed polio vaccine which carries his name. Dr. Salk explained in great detail why the Orimune or live vaccine insert in this case was inadequate or misleading. In his testimony, Dr.

Salk was specifically asked these questions and gave these answers:

"Q. Now, I want to tie this to the defendant's package insert, that's where I'm going, Doctor. Do you have an opinion to a reasonable medical probability as to whether or not the package insert for Orimune in 1975 was misleading in regard to the way in which they presented the risk of contact and recipient polio?

"A. Yes.

"Q. And what is that opinion?

"A. It's my opinion that it's misleading."

Why has the majority rejected his testimony as a matter of law?

At the close of the evidence, the defendants contended that their warning was adequate as a matter of law. The trial court overruled that motion, holding that the adequacy of the warning was a question of fact for the jury. The case was submitted to the jury, which obviously found the warning to be inadequate. Twelve Kansas citizens on the jury, the trial judge, and three members of this court have concluded that the adequacy of the warning was a fact issue.

The rules to be used by an appellate court in reviewing the trial evidence, when challenged as to its sufficiency to support a verdict, are well stated in *Cantrell v. R. D. Werner Co.*, 226 Kan. 681, 684, 602 P.2d 1326 (1979), an opinion by Justice Holmes. There he said:

"It has long been the rule that when a verdict is attacked for insufficiency of the evidence, 'the duty of the appellate court extends only to a search of the record for the purpose of determining whether there is any competent substantial evidence to support the findings. The appellate court will not weigh the evidence or pass upon the credibility of the witnesses. Under these circumstances, the reviewing court must review the evidence in the light most favorable to the party prevailing below.' *Craig v. Hamilton*, 221 Kan. 311, 313, 559 P.2d 796 (1977)."

This rule was approved by Justice Miller in his opinion in *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. at 393.

Similarly, in *Timsah v. General Motors Corp.*, 225 Kan. 305, 591 P.2d 154 (1979), the rules are concisely stated in Syllabus ¶ 1:

"When a verdict is attacked on the ground it is contrary to the evidence, it is not the function of this court on appeal to weigh the evidence or pass on the credibility of the witnesses. If the evidence with all reasonable inferences to be drawn therefrom, when considered in a light most favorable to the successful party below, will support the verdict this court should not intervene."

In *Wooderson*, 235 Kan. at 393, Justice Miller defined "substantial evidence" as evidence which possesses both relevance

and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. Stated in another way, "substantial evidence" is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion.

I respectfully question how the four-person majority can hold, from the evidence in this case, that no reasonable person could conclude that the warning failed to meet the standard required by law for the protection of the American people. In my judgment, a legitimate fact issue was presented in the case which was for the jury to determine.

It has long been the position of the Kansas Supreme Court that the right of trial by jury is a substantial and valuable right. The law favors trial by jury and the right should be carefully guarded against infringements. The State has an interest in the subject of trial by jury as a matter of public right. The State has declared its policy on the subject not only by the decisions of its courts but also through acts of the legislature. In *Bourne v. Atchison, T. & S. F. Rly. Co.*, 209 Kan. 511, 497 P.2d 110 (1972), the court declared:

"The right of trial by jury is provided for in the Constitution of the State of Kansas in Section 5 of the Bill of Rights which declares as follows:

" '§ 5. Trial by jury.

" 'The right of trial by jury shall be inviolate.'

"K.S.A. 6-238 provides a statutory right to trial by jury as follows:

" '60-238. Jury trial of right.

" '(a) *Right preserved.* The right of trial by jury as declared by section 5 of the bill of rights in the Kansas constitution, and as given by a statute of the state shall be preserved to the parties inviolate.' " p. 513.

Twenty-one years ago, in *Gard v. Sherwood Construction Co.*, 194 Kan. 541, 400 P.2d 995 (1965), Justice Wertz had this to say about the importance of the right to trial by jury:

"The right of every individual citizen to a trial by jury is of ancient origin, and as now practiced is the result of a long process of development. Having early been regarded as a right, it was in England first guaranteed as such by the Magna Charta. It was introduced in this country by the English colonists who considered it a right under the English law, and is regarded as a basic and fundamental feature of American jurisprudence, and has since the organization of our government been incorporated in the form of expressed guaranties in the constitutions of both state and federal governments. It is a substantial and valuable right and should never be lightly denied. The law favors trial by jury, and the right should be carefully guarded against infringements (50 C.J.S., Juries, § 9, p. 722); and a trial court in the exercise of its prerogatives in determining questions of law,

only, in these kinds of cases should not usurp the power and function of the jury in weighing evidence and passing upon questions of fact." p. 549.

The majority of this court in this case, on the basis it is determining a question of law, has usurped the power and function of the jury by weighing evidence and by passing upon the credibility of witnesses. From this action, I must respectfully dissent.

I also dissent from the decision of the majority that, although defendants American Cyanamid Company and Lederle Laboratories are not liable as a matter of law, the verdict of the jury that the defendant physician, Dr. Vernon L. Branson, was without fault should be permitted to stand, with the result that the plaintiff Johnson is completely denied any remedy in the case. The majority has recognized the rule adopted by this court in *Turnbull v. Byram*, 235 Kan. 891, Syl. ¶ 2, 684 P.2d 429 (1984), which states:

"Where the jury finds a party to an action negligent and the record on appeal discloses as a matter of law that party is not negligent, the negligence of the remaining parties to the action must be redetermined by the factfinder and the percentages of fault of the remaining parties reassigned on retrial."

The court refuses to apply that holding to the present case on the basis that the jury's verdict that the defendant Dr. Branson was not at fault concludes the matter, because the plaintiff failed to appeal from the jury's verdict on that issue. Such a ruling is manifestly unfair. The evidence in the case is absolutely undisputed and, in fact, it is admitted by Dr. Branson that no warning of any kind was given to the plaintiff, Emil E. Johnson, as to the dangers of Orimune and the alternative vaccine available. The cases hold that the ultimate consumer is entitled to this information as a matter of law so he can make an informed decision whether to expose himself to it. The majority opinion does not dispute that principle. If the warning was sufficient as a matter of law to convey the dangers and alternatives involved to the physician, and the physician did not convey that information to the plaintiff, then it would logically follow that the physician is liable for failure to carry out his duty to give the required warning to Mr. Johnson.

The jury in this case was required by the court to determine the adequacy of the warning given by defendants, American Cyanamid Company and Lederle Laboratories, and also to de-

termine whether or not Dr. Branson should be held liable for failure to understand the dangers of the oral live vaccine. The jury squarely placed the causal fault on the drug manufacturer, obviously holding that the warning was so inadequate and inept that Dr. Branson could not have reasonably realized the dangers involved. If the jury had been instructed that the plaintiff was entitled as a matter of law to a warning from Dr. Branson and that Dr. Branson should have known from the package insert the dangers and alternatives involved and should have conveyed that information to Emil E. Johnson so that he could have made an intelligent decision, the jury would have certainly concluded that Dr. Branson failed his duty by failing to give any warning of any kind. If this case is to be reversed on the basis that the drug companies' warning was adequate as a matter of law, certainly the plaintiff should be entitled to a new trial against Dr. Branson under appropriate instructions from the trial court.

The law seems to be well settled that on reversing a case, the appellate court will ordinarily direct a new trial if, under the circumstances of the case, this is required to attain justice. Usually, an appellate court will not undertake to render a final judgment in a case where questions of fact are present, even though it may have the power to do so. The necessity for a new trial is deemed to exist whenever a jury verdict might be different from what it was in a trial where errors were committed. 5 Am. Jur. 2d, Appeal and Error § 963, p. 390, and the many cases cited therein.

It is true that in most jurisdictions today a judgment against multiple tortfeasors may be reversed as to one such defendant without affecting the judgments as to the others. However, even under this rule, the courts will not enter such a partial reversal where substantial justice requires a reversal as to all defendants, as where it appears that a different verdict probably or possibly would have been rendered against the remaining defendant if that defendant had been sued alone or if the jury had realized that the remaining defendant would be solely liable.

Almost all jurisdictions recognize the rule that where the rights of the parties are so intermingled or where the error permeates the entire case the court should reverse as to parties not involved in the appeal. This court in *Angell v. Railway Co.*, 98 Kan. 268, 157 Pac. 1196 (1916), stated that the more reason-

able as well as the more modern rule is that a judgment against joint tortfeasors may be affirmed as to part of them and reversed as to the others *but only where no substantial injustice will result from that procedure.* In *Beachy v. Jones,* 108 Kan. 236, 245, 195 Pac. 184 (1921), the court stated that in order to prevent a miscarriage of justice, the new trial granted by the court should be on all of the issues involved and between all the parties to the original action.

This rule is especially important in comparative negligent cases. In *Kenneally v. Thurn,* 653 S.W. 2d 69 (Tex. Civ. App. 1983), a motorcyclist brought an action for damages from a collision against the motorist, the city, and the property owner. The trial court sustained the motion of the city for a directed verdict. The plaintiff appealed. The appellate court, in reversing, granted a new trial against all defendants, stating:

"We cannot say that reversing the judgment of the trial court only insofar as plaintiffs' claim against the City of San Antonio is concerned would not produce unfairness to plaintiffs. Because of the doctrine of comparative negligence, plaintiffs are entitled to a comparison of the extent of the causal negligence of all parties to the suit. We cannot say that the error in excluding the City of San Antonio from the process of attributing causal negligence to each party did not affect the jury verdict in this case." 653 S.W. 2d at 75.

In *Sullivan v. Methodist Hospitals of Dallas,* 699 S.W. 2d 265 (Tex. Civ. App. 1985), a patient and her husband sued the hospital and doctor for injuries incurred when a sponge was left in her abdomen following a Cesarean section. The appellate court reversed and remanded the entire case for a new trial, because only clearly separable issues should be severed. The court stated that the doctrine of comparative negligence requires reversal and a new trial as to all multiple defendants in an action for damages, even though error has been found only as to one defendant. 699 S.W. 2d at 273-74.

To the same effect are *Rose (Betty) v. Whitbeck,* 278 Or. 463, 564 P.2d 671 (1977); *Kure v. Chevrolet Motor Division,* 581 P.2d 603 (Wyo. 1978); and *Kuhn v. Kuhn,* 301 N.W. 2d 148 (N.D. 1981).

Today the plaintiff, Emil E. Johnson, a Kansas farmer, is totally incapacitated as a result of the effect of the Orimune administered to his daughter. It is unfair to deny him any remedy whatsoever simply because this court has held that the jury was not properly instructed in the case. If this case must be reversed,

justice and reason require that a new trial be granted Mr. Johnson against the defendant Dr. Vernon L. Branson.

HERD and LOCKETT, JJ., join in the foregoing dissenting opinion.